# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANTI HOLDINGS, LLC, MALONE MITCHELL, WINN INTERESTS, LTD., EQUINOX I. A TX, GREG PIPKIN, CRAIG JOHNSTONE, TRI-C AUTHENTIX, LTD., TRI-C AUTHENTIX PREFERRED, LTD., DAVID MOXAM, JON LAL PEARCE and JIM RITTENBURG,

        Plaintiffs,

    v.

THE CARLYLE GROUP INC., CARLYLE U.S. GROWTH FUND III, L.P., CARLYLE U.S. GROWTH FUND III AUTHENTIX HOLDINGS, L.P., CARLYLE INVESTMENT MANAGEMENT L.L.C., TCG VENTURES III, L.P., BERNARD C. BAILEY, STEPHEN W. BAILEY and MICHAEL G. GOZYCKI,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2020-0657-SG

## MEMORANDUM OPINION

Date Submitted: June 20, 2024
Date Decided: January 7, 2025

Rolin P. Bissell, Paul J. Loughman, and Alberto E. Chávez, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Jonathan R. Mureen, D. Patrick Long, John Tancabel, and Margaret Booz, SQUIRE PATTON BOGGS (US) LLP, Dallas, Texas, *Attorneys for Plaintiffs*.

Albert H. Manwaring IV and Kirsten Zeberkiewicz, MORRIS JAMES LLP, Wilmington, Delaware; OF COUNSEL: Robert A. Van Kirk, Sarah F. Kirkpatrick,

Matthew W. Lachman, Patrick C. Bradley, and Cole T. Wintheiser, WILLIAMS & CONNOLLY LLP, Washington, D.C., *Attorneys for Defendants*.

**GLASSCOCK, Vice Chancellor**

This matter concerns the sale of Authentix Acquisition Company, Inc. ("Authentix" or the "Company") in 2017. Authentix, originally Isotag Technology, Inc. ("Isotag"), was in the business of preventing fraud and counterfeiting by applying "tracers" to products, through which they could be readily authenticated. Its product was innovative, but the Company was hampered by the fact that its client base was small and disproportionately included foreign governments, and thus was subject to a high level of uncertainty in ongoing demand.

The largest equity holder in Authentix was The Carlyle Group Inc. and its affiliates (collectively, "Carlyle"), which operated a private equity fund that invested in Authentix, among other entities. The fund's partnership agreement provided for a fund life of ten years, although that term has been extended after the sale of Authentix. The original fund term expired in 2017, although that did not impose a contractual obligation to exit any particular investment at that time.

The board of directors of Authentix ("Authentix' Board") began a wide-ranging sales process in 2016, culminating in a sale in late 2017 to Blue Water Energy LLP. Authentix as a business faced several challenges around the time of the sale, allegedly suppressing the price achieved. Plaintiffs are minority stockholders of Authentix. Their claim is simple: Carlyle is a controller; Carlyle's business model required it to sell Authentix in 2017, regardless of price; accordingly, it caused Authentix' Board to run a sales process that was unfair to the stockholders,

1

but from which Carlyle extracted a unique benefit, a timely exit from Authentix for Carlyle's investors' interest in the private equity fund. Accordingly, per Plaintiffs, entire fairness applies, and the damages are represented by the higher price Authentix should have brought, absent the fire-sale nature of the proceedings.

On the Defendants' Motion to Dismiss, I found that Carlyle was a controller, that the Complaint adequately pled that it had acted to achieve a non-ratable benefit denied to Plaintiffs in the sale of Authentix, and that the Complaint therefore states a claim. Trial ensued.

Post trial, I conclude that Carlyle wanted the sale to go forward in 2017, but that its interest was the same as the minority stockholders—to maximize the value of its investment. It did not need Authentix to be sold 2017, it did not force a fire sale, and it did not extract a non-ratable benefit from the sale. Although Carlyle's investors had expectations of monetizing their investments around the ten-year mark, Carlyle's fund was a bog-standard equity-fund investment vehicle, and there was no "pressure" for a quick exit beyond that inherent in the business model itself. Carlyle did not extract a non-ratable benefit, and the sale to Blue Water Energy was arms-length. Business judgment therefore applies to the sale, and I find for Defendants, accordingly. My rationale follows.

# I. BACKGROUND

## A. Factual Background[1]

### 1. The Parties and Relevant Non-Parties

Plaintiff Manti Holdings, LLC ("Manti") is a Delaware limited liability company.[2] Manti and its related companies own and operate oil and gas exploration interests.[3] Manti was an investor in Authentix, originally investing in its predecessor, Isotag, in 1996.[4] Manti owned both common and preferred stock in Authentix.[5] Non-party Lee Barberito was Manti's representative on Authentix' Board.[6]

Plaintiff Malone Mitchell was a common and preferred stockholder of Authentix from April 2008 until Authentix' sale on September 13, 2017.[7]

---

[1] This Memorandum Opinion only contains facts necessary to my analysis. Citations to the parties' joint trial exhibits are referred to by the numbers provided by the parties and cited as "JX__". *See* Stipulation and [Proposed] Joint Pretrial Ord., Ex. A, Dkt. No. 284. Citations to the parties' stipulated pre-trial order are cited as "PTO ¶ __". Granted (Stipulation and [Proposed] Joint Pretrial Ord.), Dkt. No. 317. References to the trial transcripts are cited as "Tr. (Witness Name) __:__". Trial Tr.–Vol. I–dated 01-22-2024, Dkt. No. 327; Trial Tr.–Vol. II–dated 01-23-2024, Dkt. No. 328; Trial Tr.–Vol. III–dated 01-24-2024, Dkt. No. 329; Trial Tr.–Vol. IV–dated 01-25-2024, Dkt. No. 330; Trial Tr.–Vol. V–dated 1-26-2024, Dkt. No. 331; Trial Tr.–Vol. VI–dated 1-29-2024, Dkt. No. 332; Trial Tr.–Vol. VII–dated 1-30-2024, Dkt. No. 333.
[2] PTO ¶ 12.
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.* ¶ 13.

Plaintiff Winn Interests, Ltd. is a Texas limited liability company that was a common and preferred stockholder of Authentix from April 2008 until Authentix' sale on September 13, 2017.[8]

Plaintiff Equinox I. A TX is a Texas partnership that was a common and preferred stockholder of Authentix from April 2008 until Authentix' sale on September 13, 2017.[9]

Plaintiff Greg Pipkin was a common stockholder of Authentix from April 2008 until Authentix' sale on September 13, 2017.[10]

Plaintiff Craig Johnstone was a common and preferred stockholder of Authentix from April 2008 until Authentix' sale on September 13, 2017.[11]

Plaintiff Tri-C Authentix, Ltd. is a Texas limited partnership that was a common stockholder of Authentix from April 2008 until Authentix' sale on September 13, 2017.[12]

Plaintiff Tri-C Authentix Preferred, Ltd. is a Texas limited partnership that was a common stockholder of Authentix from April 2008 until Authentix' sale on September 13, 2017.[13]

---

[8] *Id.* ¶ 14.
[9] *Id.* ¶ 15.
[10] *Id.* ¶ 16.
[11] *Id.* ¶ 17.
[12] *Id.* ¶ 18.
[13] *Id.* ¶ 19.

4

Plaintiff David Moxam served as Chairman and CEO of Authentix' predecessor, Isotag, and then of Authentix from 2002 until October 2012.[14] Since departing Authentix, Moxam has worked with Manti or its affiliates.[15] Moxam was also a common and preferred stockholder of Authentix from April 2008 until Authentix' sale on September 13, 2017.[16]

Plaintiff Jon Lal Pearce was a common and preferred stockholder of Authentix from April 2008 until Authentix' sale on September 13, 2017.[17] Pearce previously served as Vice President of Sales and Marketing for Isotag from 2000 to 2003 and then for Authentix from 2003 until 2014.[18]

Plaintiff James "Jim" Rittenburg was a common and preferred stockholder of Authentix from April 2008 until Authentix' sale on September 13, 2017.[19] Rittenburg served as a Vice President of Technology for Biocode Inc., another predecessor to Authentix, from 1994 to 2003 and then as Vice President of Healthcare and Pharmaceuticals for Authentix from 2003 to 2014.[20]

Defendant The Carlyle Group Inc. ("Carlyle Group") is the successor entity for liability purposes to The Carlyle Group L.P., which, during the relevant period,

---

[14] *Id.* ¶ 20.
[15] *Id.*
[16] *Id.*
[17] *Id.* ¶ 21.
[18] *Id.*
[19] *Id.* ¶ 22.
[20] *Id.*

was an owner, through several different tiers of entities, of other defendant entities listed below.[21]

Defendant Carlyle U.S. Growth Fund III, L.P. ("CUSGF III"), which is also commonly referred to as "CGP III" in internal correspondence, is the private equity fund that purchased common and preferred stock in Authentix between April 2008 and 2013.[22] At its formation in May 2006, CUSGF III was named Carlyle Venture Partners III, L.P., which was changed to its current form in August 2009.[23]

Defendant Carlyle U.S. Growth Fund III Authentix Holdings, L.P. ("Authentix Holdings") was formed in 2011 to take ownership of the Authentix stock purchased by CUSGF III.[24] As of the sale date of Authentix on September 13, 2017, Authentix Holdings owned 70% of Authentix' preferred stock and 52% of its common stock.[25]

Defendant Carlyle Investment Management L.L.C. ("Carlyle Investment") was the investment advisor for CUSGF III.[26]

Defendant TCG Ventures III, L.P. ("TCG") is the general partner of CUSGF III.[27] The general partner of TCG is TCG Ventures III, L.L.C.[28] The relationships

---

[21] *Id.* ¶ 24.
[22] *Id.* ¶ 25.
[23] *Id.* I refer to this fund only as CUSGF III for clarity.
[24] *Id.* ¶ 26.
[25] *Id.*
[26] *Id.* ¶ 27.
[27] *Id.* ¶ 28.
[28] *Id.*

between Carlyle Group, CUSGF III, Authentix Holdings, Carlyle Investment, and

TCG are depicted in Figure One.[29]

---

[29] Ex. 1–3 to Stipulation and [Proposed] Joint Pretrial Ord., Dkt. No. 284. This simplified diagram only includes the relationships between entities pertinent to my analysis and does not include the numerous other entities legally connected to these entities in Carlyle's complex organizational structure.



Figure One. Simplified structure of the pertinent Carlyle entities.

8

Defendant Bernard C. Bailey became a member of Authentix' Board in October 2011.[30] From October 2012 to May 2018, he served as Chairman of the Board and CEO of Authentix.[31] I refer to this Defendant as "B. Bailey" throughout, for the sake of clarity.

Defendant Stephen ("Steve") W. Bailey is a Partner and Managing Director at Carlyle Group.[32] He served on Authentix' Board as designee of CUSGF III and then Authentix Holdings from April 2008 to September 13, 2017, the date of the sale of Authentix.[33] I refer to this Defendant as "S. Bailey" throughout, for the sake of clarity.

Defendant Michael G. Gozycki was a Managing Director at Carlyle Group from 2016 to 2022.[34] He served on the Carlyle deal team for Authentix from 2008 to September 13, 2017, the date of the sale of Authentix, and was a Vice President before his promotion to Managing Director.[35] He served on Authentix' Board as the designee of Authentix Holdings from March 2013 to September 13, 2017.[36]

Non-party J.H. Whitney & Company ("Whitney") is a private equity firm that invested in Authentix in 2008 through a fund called Whitney VI.[37] As of Authentix'

---

[30] PTO ¶ 29.
[31] *Id.*
[32] *Id.* ¶ 30.
[33] *Id.* ¶¶ 30, 54.
[34] *Id.* ¶ 31.
[35] *Id.* ¶¶ 31, 54.
[36] *Id.* ¶ 31.
[37] *Id.* ¶ 42.

sale date (September 13, 2017), Whitney owned 25% of Authentix' preferred stock and 16% of its common stock.[38]

Non-party Robert W. Baird & Co. ("Baird") is the investment bank retained by Authentix on January 8, 2016, to broker the sale of Authentix.[39]

Non-party Paul Vigano served on Authentix' Board from April 2008 until September 13, 2017, as Whitney's representative.[40]

I refer to Gozycki, S. Bailey, and B. Bailey collectively as the "Director Defendants." I refer to S. Bailey, B. Bailey, Gozycki, Vigano, and Barberito as the "Board."[41]

### 2. Authentix' Business and Customer Concentration

Authentix provides authentication technologies that are used by customers to ensure the integrity of their products and by governments to prevent illicit trade.[42] Authentix has three major divisions: (1) downstream oil and gas, (2) currency and tax stamps, and (3) brands and pharmaceuticals.[43] Authentix' largest business

---

[38] *Id.*
[39] *Id.* ¶ 36.
[40] *Id.* ¶ 43.
[41] From April 2008 to October 2011, there were four members on Authentix' Board: David Moxam (Authentix' then-CEO), Lee Barberito, Paul Vigano, and S. Bailey. *Id.* ¶ 57(d). In October 2011, Carlyle designated B. Bailey to Authentix' Board as the fifth director. *Id.* ¶ 58. In October 2012, David Moxam left Authentix' Board, and B. Bailey became CEO and Chairman of Authentix' Board. *Id.* ¶ 59. From March 2013 through September 13, 2017, Authentix' Board included B. Bailey, S. Bailey, Gozycki, Vigano, and Barberito. *Id.* ¶ 60.
[42] *Id.* ¶ 32.
[43] *Id.*

segment is its oil and gas business, which is dominated by contracts with governments of oil-producing countries.[44] These governments of oil-producing countries are volatile business partners due to the exposure to geopolitical risk.[45]

### 3. CUSGF III Invests in Authentix

In April 2008, Carlyle, through CUSGF III, bought $40 million in Authentix' Series A convertible preferred stock.[46] Whitney also bought $15 million in Series A convertible preferred stock.[47] As a result of Carlyle's investment and Whitney's investment, Whitney and Carlyle gained a majority interest in Authentix.[48]

In connection with the investments, on April 18, 2008, the stockholders of Authentix entered into a stockholders agreement (the "Stockholders Agreement") that included a drag-along provision that stated that:

> In the event that . . . a Company Sale is approved by the Board and . . . the holders of at least fifty percent (50%) of the then-outstanding Shares or . . . the Carlyle Majority, each Other Holder shall consent to and raise no objections against such transaction . . . .[49]

In my Memorandum Opinion dated February 14, 2022, I found that the language in the Stockholders Agreement did not constitute a waiver of Plaintiffs'

---

[44] JX54 at 51, 60; *see* JX784 at 31:18–32:8.
[45] Tr. (Pearce) 168:5–173:23 (explaining that doing contract work with developing countries exposes Authentix to risks from economic stability, corruption, and local politics).
[46] PTO ¶ 49.
[47] *Id.*
[48] *Id.* ¶ 50.
[49] *Id.*; JX13 § 3(e).

right to bring a post-closing damages action challenging alleged breaches of fiduciary duty in connection with the sale of Authentix.[50]

CUSGF III is a private equity fund within the family of investment vehicles managed by Carlyle.[51] CUSGF III is structured as a limited partnership by and among TCG (an affiliate of Carlyle), as general partner, TCG Ventures Investment Holdings III, L.P. (an affiliate of Carlyle), as initial limited partner,[52] and the limited partners (i.e., investors in the fund).[53] CUSGF III's limited partnership agreement (the "Limited Partnership Agreement") provides for a ten-year fund life,[54] which is the lifecycle typical of most private equity funds.[55] During the first few years of a fund launch, in the "fundraising period," the fund's focus is on raising capital from investors.[56] Then, the fund will turn to investing in companies in the "investment period," and working with the companies' management teams to create value in the "holding period."[57] After the fund has a "fully invested portfolio," it will begin looking for exit opportunities and to monetize its investments (e.g., selling an asset

---

[50] *Manti Hldgs., LLC v. Carlyle Gp. Inc.*, 2022 WL 444272, at *1 (Del. Ch. Feb. 14, 2022) ("Feb. Mem. Op.").
[51] Tr. (S. Bailey) 1113:17–1114:18.
[52] JX1 ("Limited Partnership Agreement") at 5. TCG Ventures Investment Holdings III, L.P. is also the Investment Limited Partner of CUSGF III and an affiliate of the general partner, TCG. *Id.* at 15.
[53] *Id.* at 5, 14–15.
[54] *Id.* § 2.7.
[55] Tr. (Timmins) 734:6–14, 737:17–20.
[56] Tr. (Coburn) 1680:10–1681:11; JX819 at 11–12.
[57] JX819 at 11–12.

like Authentix);[58] the invested capital and a portion of the proceeds are then distributed to a fund's limited partners and a portion of the proceeds (called "carried interest") to its general partner, or in the case of CUSGF III, to its Investment Limited Partner, which is an affiliate of CUSGF III's general partner, TCG.[59]

Private equity funds prefer to exit before or around the ten-year mark of its lifecycle, but it is not typically mandatory to exit at that time.[60] The preference to exit around the ten-year mark exists because when a fund reaches the end of its term, it can no longer obtain additional capital from its investors and thus, cannot make further investments in portfolio companies.[61] However, a fund can continue to hold and manage its remaining portfolio companies after its term ends (even without the general partner of the fund seeking an extension of the fund life).[62] Alternatively, the general partner of the fund *can* seek an extension of the fund life, by requesting permission from an advisory board of the largest investors in the fund (i.e., the investor advisory committee or "IAC"), or the majority of the underlying limited

---

[58] Tr. (Coburn) 1680:18–1681:11; *see also* JX819 at 12.
[59] Limited Partnership Agreement at 9, 14–15; *id.* §§ 3.4–3.5.
[60] Tr. (Coburn) 1681:12–22, 1691:19–1692:7 (explaining that the tenure life of the fund is "not a forcing function," instead the fund assesses each portfolio company on a case-by-case basis to see if the asset will appreciate, depreciate, or remain static); Tr. (Timmins) 737:1–7 (agreeing that funds are not required to immediately sell remaining assets upon reaching the end of its fund life).
[61] Tr. (Coburn) 1688:23–1690:4; Tr. (Gozycki) 1794:22–1795:17.
[62] Tr. (Coburn) 1684:15–1687:16, 1688:8–1690:4; *see also* Tr. (Gozycki) 1794:22–1795:5.

13

partners of the fund; if granted, the fund can continue to invest capital to support its portfolio companies.[63]

CUSGF III's ten-year term did not impose a deadline for selling its portfolio of companies.[64] The initial fund term for CUSGF III lasted until September 30, 2017,[65] and CUSGF III planned to exit Authentix in 2017.[66] However, Carlyle has had funds where they continued to hold investments after term expiration.[67] The terms of Carlyle's funds, including CUSGF III, can also be extended (in the manner discussed above),[68] which would allow the funds to continue investing in their portfolio companies.[69]

---

[63] Tr. (Coburn) 1683:13–1684:2, 1685:11–15, 1689:4–18; Limited Partnership Agreement § 2.7.

[64] Tr. (Coburn) 1681:12–1688:7; Limited Partnership Agreement § 2.7.

[65] JX3 (amending the "Final Closing Date" in the Limited Partnership Agreement to "September 30, 2007"); Limited Partnership Agreement § 2.7 (stating that the partnership "shall continue in business through the close of business on the ten-year anniversary of the Final Closing Date"). Ten years after September 30, 2007, which was amended to replace "Final Closing Date" is September 30, 2017.

[66] *See, e.g.*, JX318.

[67] *See, e.g.*, Tr. (S. Bailey) 1113:17–1115:1, 1116:18–1117:3, 1117:10–15; Tr. (Coburn) 1684:15–1685:10.

[68] Limited Partnership Agreement § 2.7; Tr. (Coburn) 1683:13–1684:2.

[69] Tr. (Coburn) 1683:13–1684:2, 1685:11–15, 1689:4–18. For CUSGF III specifically, its Limited Partnership Agreement states "the General Partner in its discretion may with the consent of the Investor Advisory Committee or a Majority in Interest of the Combined Limited Partners extend the term of the Partnership for successive one-year periods up to a maximum of two years." Limited Partnership Agreement § 2.7.

### 4. CUSGF III Distributes Proceeds of its Investments in a Waterfall Distribution

For CUSGF III, investment proceeds from portfolio companies are distributed in line with a distribution "waterfall" set out in the Limited Partnership Agreement.[70] CUSGF III must first return 100% of invested capital (and provide a preferred 7% per annum cumulative compounded internal rate of return on the limited partners' capital) to limited partners.[71] Only after the preferred return to limited partners has been met, will carried interest distributions, which is Carlyle's portion of the proceeds received through the Investment Limited Partner,[72] be made from the additional investment proceeds.[73] The additional investment proceeds are further split between the Investment Limited Partner and the limited partners of the fund according to the specific terms of the "waterfall."[74] Investment proceeds are distributed through the "waterfall" on an ongoing basis; as a result, the carried interest distributions may be (in fact, have been) made prior to the disposition of all portfolio companies.[75]

If the Investment Limited Partner receives more than its fair share of proceeds through the carried interest distributions, a clawback provision will trigger and

---

[70] *Id.* § 3.5 ("Amounts and Priority of Distributions").
[71] *Id.* § 3.5(i)–(ii).
[72] *Id.* at 9, 14–15.
[73] *Id.* § 3.5.
[74] *Id.* § 3.5.
[75] *Id.* §§ 3.4(c), 3.5.

15

require Carlyle and its deal team to return excess distributions to the limited partners of CUSGF III.[76] As a simplified example, if CUSGF III fails to meet the 100% invested capital and 7% preferred return obligation (annually compounded) for any period of time for its investments when it makes a distribution, Carlyle and its deal team, through the Investment Limited Partner, may have to return excess carried interest from previous distributions to make up for the shortfall in the preferred return for that period of time.[77] Importantly, the limited partners of CUSGF III are entitled to the 7% preferred return only on capital that is still deployed in the fund's remaining portfolio companies, which included Authentix until the time of its sale.[78] When remaining portfolio companies are sold and the capital is returned to the limited partners, the 7% preferred return per annum compounded ceases for that capital.[79] Plaintiffs argue that Carlyle was motivated to sell Authentix to cease the 7% preferred return and prevent clawback, as the proceeds from which Carlyle's carried interest was computed would then cease to be diminished by the 7% preferred return.[80]

---

[76] Tr. (Timmins) 724:4–8; Limited Partnership Agreement § 9.4.
[77] Tr. (Timmins) 723:22–724:8; Limited Partnership Agreement § 9.4.
[78] Tr. (Timmins) 722:7–723:8.
[79] *Id.*
[80] *See* Pls.' Post-Trial Opening Br. 9–10, Dkt. No. 337 ("Pl. PTOB").

5. Authentix' Performance Declined After Carlyle's Investment

After Carlyle's investment, Authentix' performance declined.[81] In 2008, Authentix' largest contracts were with India and Malaysia.[82] In 2009, India stopped paying Authentix—even though it was contractually bound to do so,[83] and in 2011, Malaysia also stopped paying Authentix for services and products that Authentix had already provided.[84] Overall, Authentix' revenues declined at annual rate of approximately 7% from 2007 to 2012.[85]

Between 2009 and 2013, Authentix issued four additional rounds of convertible preferred stock because of various issues with liquidity.[86] Each round was open to all existing investors on a pro rata basis,[87] and Whitney and certain other Plaintiffs (such as Manti) took the opportunity to invest as well.[88] In total, Carlyle invested $60.3 million in Authentix, with its initial investment of $40 million and an additional $20.3 million across the four equity raises (which included additional capital to make up for stockholders who did not purchase their proportionate share).[89] By 2013, CUSGF III was the majority owner of Authentix and by the time

---

[81] JX54 at 50.
[82] *Id.* at 53.
[83] Tr. (Moxam) 113:14–114:3; Tr. (Pearce) 170:7–20; JX54 at 53.
[84] Tr. (Moxam) 111:19–112:5; JX54 at 53.
[85] JX54 at 50.
[86] PTO ¶ 51; *see, e.g.*, Tr. (Moxam) 109:12–15; Tr. (Gozycki) 1769:19–1770:7.
[87] PTO ¶ 51.
[88] *Id.*
[89] *Id.* ¶¶ 49, 51.

of the sale of Authentix in September 2017, Authentix Holdings, which took ownership of the Authentix stock from CUSGF III,[90] owned 70% of Authentix' preferred stock and 52% of Authentix' common stock.[91]

### 6. David Moxam Leaves Authentix and B. Bailey is Appointed as Authentix' New CEO

Towards the end of the (financially-disappointing) 2008-2012 period, Authentix' CEO Moxam worked part-time.[92] In reaction to Authentix' performance, Vigano and S. Bailey told Moxam that he could either resign or be fired, and Moxam left Authentix in 2012.[93] In October 2012, B. Bailey was appointed as Authentix' new CEO.[94] As part of B. Bailey's employment agreement, the Company approved a "special cash bonus" that provided B. Bailey was entitled to receive 10% of the consideration received by Authentix in the event of a sale of Authentix in excess of $50 million, up to $80 million, which amounts to a maximum of $3 million.[95]

In 2013, Authentix' performance began to improve. In July 2013, Authentix signed a contract with Saudi Aramco ("Aramco") for a pilot program.[96] After a

---

[90] *Id.* ¶ 26.
[91] *Id.* ¶¶ 26, 51.
[92] Tr. (Moxam) 117:10–118:11.
[93] *Id.* at 118:12–119:4.
[94] PTO ¶ 59; JX48; JX50.
[95] JX48 at 2–3 (employment agreement providing "[i]n connection with the first Change in Control to occur following the Effective Date, the Executive [B. Bailey] will be eligible to receive a cash bonus equal to ten percent (10%) of Total Consideration in excess of $50,000,000 and less than or equal to $80,000,000").
[96] JX60.

successful pilot program, Authentix won a fuel-marking contract with Aramco in June 2015.[97] The Aramco contract contributed approximately $10 million in revenue in 2014 and approximately $19 million in revenue in 2015, making it Authentix' largest contract.[98] In 2014, Authentix began realizing significant revenue from a 2012 tax-stamp contract with Ghana ("Ghana Tax").[99] Overall, Authentix achieved $13 million in EBITDA in 2015 compared to the -$5.5 million in 2012 EBITDA.[100]

### 7. Authentix Considered a Partial Sale in 2014 and Commenced a Sale Process for the Entire Company in October 2015

In 2014, the full Board explored divesting the brand and currency and tax stamp businesses,[101] and hired an investment bank, Imperial Capital, to assist.[102] However, Authentix halted the partial sale process after receiving "some inbound attraction for the entire company."[103]

In Fall 2015, the full Board (including Barberito, the Board representative for Manti) supported the decision to begin a sale process for Authentix.[104] In October 2015, Authentix invited five investment banks to compete for the opportunity to run

---

[97] *Id.*; JX83 at 1; Tr. (B. Bailey) 1632:8–22.
[98] JX565 (found on "O&G" tab of the financial spreadsheet).
[99] *Id.* (found on the "C&TS" tab of the financial spreadsheet).
[100] JX142 at 33.
[101] Tr. (S. Bailey) 1143:6–20; JX79 at 71. The internal name for the partial sale process was "Project Focus." JX79 at 71.
[102] Tr. (Barberito) 493:10–494:6; Tr. (B. Bailey) 1479:4–18; JX79 at 71.
[103] Tr. (B. Bailey) 1479:19–1480:7.
[104] Tr. (Barberito) 494:13–19; PTO ¶ 12.

a sale process.[105]  After each bank made a pitch presentation,[106] which included preliminary estimates on valuation that were based on a "limited set of information,"[107] The Board unanimously selected Baird to run the sale process.[108] The preliminary valuation of the bankers ranged from $200 million to $275 million.[109]

Authentix expected the formal sale process to launch in the third quarter of 2016,[110] which was to follow the "good news"[111] of the anticipated Aramco contract renewal in May 2016.[112]  However, such news was not forthcoming; in May 2016, Aramco informed Authentix that it would only extend the program for two months (from May to July) rather than the two-year renewal contemplated by the contract.[113] Then, in August 2016, Aramco signaled that the contract would not be renewed on its original terms by issuing only a seven-month extension (through the end of

---

[105] Tr. (S. Bailey) 1154:4–20.
[106] JX99–103 (including pitches by Credit Suisse, Deutsche Bank, Imperial Capital, Raymond James, and Baird).
[107] Tr. (S. Bailey) 1158:23–1159:21, 1161:10–19.
[108] JX134; Tr. (S. Bailey) 1162:11–22.
[109] JX99 at 18 (Credit Suisse reference range from $225 million to $275 million); JX100 at 20 (Deutsche Bank preliminary valuation in the $200 million to $275 million range); JX101 at 30 (Imperial Capital average valuation range between $145.6 million and $177.7 million and 2016 average only range between $208.4 million and $250.1 million); JX102 at 63 (Raymond James preliminary valuation range between $225 million and $275 million); JX103 at 23 (Baird preliminary valuation at an excess of $200 million).
[110] Tr. (Barberito) 498:17–499:1.
[111] Tr. (B. Bailey) 1483:24–1484:22.
[112] JX146; JX148.
[113] JX171 at 3–4; Tr. (S. Bailey) 1165:6–22.

February 2017) that discounted prices by 30%.[114] In addition, Aramco planned on opening the program to competitive rebidding.[115]

Baird and Authentix analyzed the potential impact of losing the Aramco business on Authentix' overall financials.[116] The Board decided to launch the sale process in September 2016 to evaluate whether buyers could appropriately value Authentix.[117] Baird's recommendation in September 2016 was to proceed with a "scoping" (not broad) process by approaching buyers in a customized manner to market Authentix ahead of a regular sale in 2017.[118] The scoping process was to launch in the Fall of 2016 because the directors believed that the uncertainty surrounding contract renewal (given Authentix' volatile customer base) was unlikely to improve.[119] There was also a possibility that Authentix might lose Aramco to a competitor altogether during the rebidding process.[120] Baird did reduce its initial

---

[114] JX192 at 6; Tr. (S. Bailey) 1168:1–23.
[115] JX192 at 6; JX179; Tr. (B. Bailey) 1491:4–1492:12.
[116] JX204; Tr. (B. Bailey) 1497:23–1499:20, 1500:13–16.
[117] Tr. (B. Bailey) 1500:13–16, 1507:2–1508:8, 1509:15–1510:17; JX189 at 23; JX221.
[118] Tr. (Renner) 1400:8–1402:6; Tr. (Atkins) 2100:8–2101:19; JX207 at 5; *see also* Tr. (B. Bailey) 1499:13–20.
[119] Tr. (B. Bailey) 1499:13–20 (discussing how Baird advised Authentix to get started with the sale process immediately because the "news may be good going forward; then it may not be good" and that "there are ways to deal with this uncertainty"); Tr. (S. Bailey) 1184:21–1186:22 (discussing the volatility of Authentix given the "long list of issues with the contracts"); JX221; JX207 at 5.
[120] Tr. (S. Bailey) 1186:11–1187:4.

$200 million valuation estimate of Authentix,[121] but it communicated to Authentix that Authentix should test out the market through a scoping process.[122]

### 8. Authentix' Scoping Process Begins in Fall 2016

In September 2016, Baird assembled a list of potential strategic buyers.[123] Everyone on the Board had an opportunity to provide feedback to the list, and Barberito suggested no additional names for the list.[124] Baird began scoping calls by September 21, 2016,[125] and the entire Board, including Barberito, was advised of that development.[126] Baird started with strategic buyers, but ultimately contacted a total of 127 potential buyers, including 27 financial buyers.[127] During the outreach, Baird's talking points touched on the fact that Authentix faced certain challenges, including that its largest contract (Aramco) had a pending contract renewal milestone, in order to generate "credib[ility]."[128] In addition, Baird referenced Carlyle's "hold period,"[129] which is standard information that potential buyers want.[130]

---

[121] *Compare* JX103 at 23, *with* JX229 at 1.
[122] JX207 at 5; Tr. (Renner) 1400:8–1402:6.
[123] JX215; JX217 at 5–9.
[124] JX221; Tr. (Barberito) 515:19–518:7.
[125] JX221.
[126] *Id.*
[127] JX267; JX336 at 3–4, 9–10; JX217.
[128] JX216; Tr. (Renner) 1425:17–1427:5 (stating "[y]ou can't hide something like that and then say, oh, by the way. Because then they're going to be, like, you weren't credible, and why didn't you tell me that?").
[129] JX215; JX216 at 1.
[130] Tr. (S. Bailey) 1190:8–1191:6; Tr. (Renner) 1404:16–1405:1; Tr. (Gozycki) 1773:2–15.

Baird's outreach yielded 18 potential buyers that attended "fireside chat meetings."[131]  Four potential buyers ultimately submitted initial indications of interest to buy Authentix: Intertek Group PLC ($120 million); Innospec Inc. ($177 million with unspecified contingency for "Saudi [Aramco] contract"); OpSec Security ($100 million plus "two equal installments of $22.5 million in December 2017 and December 2018 contingent on Authentix achieving at least 95% of Saudi [Aramco] revenue and profitability targets in each respective year"); and Thyssen Bornemiscza Group ("TBG") ($207 to $248 million).[132]  Other potential buyers declined to proceed because of: (1) large contract renewal risk; (2) foreign end markets (geopolitical/Federal Corrupt Practices Act risk); (3) customer concentration; (4) management transition; (5) long sales cycle and pipeline; (6) alternative acquisitions; and (7) lack of strategic fit/limited synergies.[133]

### 9. Potential Buyers Proceed with Due Diligence

Authentix decided to move forward with all four potential buyers, Intertek, Innospec, OpSec, and TBG, for due diligence to prepare for the submission of the second round of indications of interest in February 2017.[134]  TBG dropped out of the process altogether, citing that it was pursuing a different significant deal.[135]  OpSec

---

[131] JX336 at 4.
[132] JX274 at 7.
[133] *Id.* at 3.
[134] Tr. (S. Bailey) 1207:10–1208:13; Tr. (B. Bailey) 1522:22–1523:8; *see* JX336 at 3, 9.
[135] Tr. (B. Bailey) 1522:22–1523:19; JX336 at 5.

conducted due diligence, but decided to pass on the opportunity because of customer concentration, contract renewal risks, and concerns about Authentix' currency business.[136] Innospec maintained its $177 million topline indication of interest, but specified that $100 million of its purchase price was contingent on obtaining three-year contracts with Aramco, Ghana (for fuel, not tax), and Cameroon.[137] Intertek provided a $140 million indication of interest, with $55 million contingent on Authentix renewing the Aramco and Ghana Tax contracts on existing terms.[138]

### 10. Barberito and Manti Join the Sale Process

In March 2017, Barberito approached S. Bailey to present a superior bid to buy Authentix.[139] Authentix gave Barberito access to the data room but S. Bailey emphasized that Barberito needed to move fast because Authentix could lose other buyers while Barberito caught up in the sales process.[140] On March 15, 2017, Barberito, acting through Manti, partnered with White Deer Energy ("WDE") to submit an indication of interest of $105 million to buy Authentix.[141] Later, WDE and Manti increased their bid to $107 million.[142] Authentix offered WDE exclusivity

---

[136] Tr. (B. Bailey) 1525:3–18; JX336 at 5.
[137] Tr. (B. Bailey) 1526:3–12; JX336 at 5.
[138] JX328; JX336 at 5.
[139] JX344 at 2; Tr. (Barberito) 360:2–362:1; Tr. (S. Bailey) 1215:13–1216:5.
[140] *See, e.g.*, JX350 at 2; Tr. (Barberito) 550:22–551:16; Tr. (S. Bailey) 1216:6–1218:15; Tr. (B. Bailey) 1530:13–1532:15; JX379.
[141] JX363.
[142] JX376; JX374 at 1–2.

24

on March 18, 2017,[143] but the Manti-WDE partnership dropped out of the process before the exclusivity period ended because WDE was not comfortable with Authentix' customer concentration "in dodgy places."[144] On April 1, 2017, Blue Water Energy LLP ("BWE"), another private equity firm,[145] joined with Manti to submit an indication of interest for $107 million to buy Authentix.[146] B. Bailey spoke with BWE partner Tom Sikorski,[147] during which conversation Sikorski told B. Bailey that Manti was looking to reengage former management.[148] B. Bailey responded that he would not remain with the Company if the buyer reengaged former management.[149] Sikorski responded that BWE would not do a deal without B. Bailey being a part of it.[150] Subsequently, BWE decided to pursue a deal on its own, without Manti.[151] Barberito and Manti did not submit a bid to buy Authentix on their own.[152]

### 11. Authentix Negotiated with BWE and Intertek

On April 13, 2017, BWE had put in its solo bid for $107 million.[153] Authentix was able to negotiate Intertek up to a bid of $115 million,[154] and in reaction, after S.

---

[143] JX376; JX374 at 1–2.
[144] Tr. (Tilney) 2065:23–2068:15; *see* JX405.
[145] *See* JX419 at 1.
[146] *Id.* at 2.
[147] PTO ¶ 45.
[148] Tr. (B. Bailey) 1541:20–1542:16.
[149] *Id.*
[150] *Id.* at 1542:21–1543:1.
[151] JX476; JX493 at 236.
[152] Tr. (Barberito) 578:2–16.
[153] JX476; Tr. (S. Bailey) 1224:19–1225:20.
[154] Tr. (S. Bailey) 1225:2–1226:1.

Bailey contacted Sikorski to negotiate a price increase, BWE increased its indication of interest to $115 million.[155] The BWE and Intertek proposals each had their advantages: BWE agreed to drop a regulatory closing requirement, which meant BWE would close the transaction even if the regulatory clearance had not been obtained; Intertek, on the other hand, had completed more diligence.[156] Authentix awarded Intertek exclusivity on April 26, 2017.[157]

After Intertek conducted additional due diligence, on May 30, 2017, it reduced its offer from $115 million to $85 million up-front cash plus $30 million contingent on Authentix securing multi-year renewals of Aramco and Ghana Tax contracts and achieving certain financial results in 2017.[158] Because of Intertek's reduced offer, Authentix decided to return to BWE for a better sale price.[159] BWE submitted an updated indication of interest of $105 million on June 7, 2017.[160] Authentix granted BWE exclusivity until July 3, 2017 on the basis of that bid.[161]

### 12. BWE Conducts Due Diligence

In June 2017, after BWE received exclusivity, BWE's extensive diligence began.[162] Prior to this point, BWE had conducted two weeks of "intensive" diligence

---

[155] JX491; Tr. (S. Bailey) 1227:19–1230:3.
[156] Tr. (S. Bailey) 1230:4–1231:23; *see* Tr. (Vigano) 1078:20–1080:7.
[157] JX510.
[158] JX517 at 1–2.
[159] Tr. (S. Bailey) 1236:23–1237:6.
[160] JX527 at 4–5.
[161] JX548 at 2; Tr. (S. Bailey) 1241:17–1242:11.
[162] Tr. (Sikorski) 2048:20–2049:7, 2051:24–2052:8.

at the time of its April 13, 2017 bid, but that had been in part focused on the management team of Authentix and Manti itself.[163]  BWE also hired KPMG accountants to do a quality of earnings assessment.[164]

BWE's diligence revealed some issues with Authentix' reported earnings, including that Authentix' accounting methods made the Ghana Tax contract appear more profitable than it was.[165]  During BWE's diligence process, B. Bailey indicated to Sikorski that Authentix' owners were content to hold the Company during the period of uncertainty if BWE was not able to confirm their $105 million purchase price.[166]  However, after weeks of diligence, BWE concluded that the fair upfront price for Authentix was between $60 million and $70 million, significantly lower than its April 2017 bid of $115 million and June 2017 bid of $105 million.[167]

### 13. Authentix Negotiates with BWE

During BWE's diligence, Authentix won the Aramco technical trials in Spring 2017 in connection with Aramco's competitive rebidding process, and Authentix knew that success in getting the Aramco contract would turn on price.[168]  The Board unanimously approved a bid for the Aramco contract with diminished terms, and communicated the terms to BWE, noting its confidence in securing the contract on

---

[163] JX493 at 236; Tr. (Sikorski) 2045:19–2047:24.
[164] *See, e.g.*, JX564 at 3.
[165] Tr. (Gozycki) 1779:14–1782:1, 1784:15–1785:7.
[166] JX557 at 1; Tr. (B. Bailey) 1571:21–1573:13.
[167] JX571 at 2.
[168] JX589 at 2; Tr. (Barberito) 454:11–24, 456:10–458:21.

that basis.[169]  In addition, Authentix received news that Ghana would agree to a plan to come current on amounts due to Authentix for the Ghana Tax contract and extend the contract for two years, which was also shared with BWE on July 16, 2017.[170]

With the above news, Authentix began negotiations with BWE.  On July 21, 2017, BWE submitted a revised indication of interest at $85 million of up front consideration, with another $20 million conditioned on Authentix achieving certain financial metrics.[171]  On July 27, 2017, Authentix countered with a $10 million increase in the up front consideration, and tied the earnout to one year performance rather than three (but with a $10 million decrease in the amount of earnout).[172]  On July 31, 2017, BWE counteroffered with an increase of the up front consideration from $85 million to $87.5 million, certain concessions on the earnout, and certain below the line adjustments.[173]  Authentix countered again, with $90 million in up front consideration and further working capital adjustments.[174]  Finally, BWE responded with its final offer on August 4, 2017,[175] keeping the upfront consideration as $87.5 million, but agreeing to give $3.5 million in additional consideration based on below-the-line adjustments.[176]

---

[169] JX589; Tr. (Barberito) 458:10–21; JX591 at 1.
[170] JX586.
[171] JX563 at 2.
[172] JX609 at 2; Tr. (S. Bailey) 1252:7–1253:7.
[173] JX611; JX611 at 4; Tr. (S. Bailey) 1253:16–1254:3.
[174] JX616 at 2; Tr. (S. Bailey) 1254:4–12.
[175] JX619.
[176] *Id.*; JX628 at 1.

On August 21, 2017, Authentix learned that Aramco had awarded the Company a new contract on terms mirroring the Authentix bid.[177] Authentix did not attempt to re-negotiate with BWE because the new contract matched BWE's assumptions for its bid, based on the information Authentix had previously communicated to BWE.[178]

### 14. Authentix Closed a Sale to BWE in September 2017

On September 12, 2017, the Board considered the sale to BWE.[179] The directors voted four to zero, with Barberito abstaining, to sell Authentix to BWE based on the economic terms set forth in BWE's August 4, 2017 letter for $87.5 million upfront and an opportunity to earn $17.5 million more based on the achievement of certain 2018 financial metrics.[180] B. Bailey, S. Bailey, Gozycki, and Vigano all voted in favor of the sale.[181] Barberito did not attend the Board meeting to vote on the Authentix sale to BWE, but he did convey his strong opposition to the sale in a letter.[182] Barberito stated he saw Authentix' upside,[183] criticized the sales process for failing to feature the potential that Authentix could launch new upstream

---

[177] JX663; JX685.
[178] Tr. (Sikorski) 2023:5–14; Tr. (S. Bailey) 1256:2–1257:9; Tr. (B. Bailey) 1585:21–1586:8.
[179] JX714.
[180] *Id.* at 4; *see* JX619 at 3.
[181] JX714 at 4; Tr. (S. Bailey) 1260:2–16; Tr. (Vigano) 1391:1–5; Tr. (B. Bailey) 1593:23–1596:3; Tr. (Gozycki) 1799:1–18.
[182] Tr. (B. Bailey) 1593:2–20; JX711.
[183] JX711 at 1.

processes,[184] suggested that a twelve month deferral of the sales process would increase shareholder value,[185] and argued that BWE did not adequately value Authentix.[186]

The sale of Authentix to BWE closed on September 13, 2017.[187] Authentix' stockholders received guaranteed consideration of $77.7 million.[188] Up to $9.8 million of additional consideration would be paid out over time in the event Authentix obtained payment on a receivable related to the Ghana Tax contract, which was eventually paid.[189] In addition, Authentix' shareholders stood to earn an additional $7.5 million if Authentix' 2018 EBITDA met or exceeded $15 million, and an additional $10 million if Authentix' 2018 EBITDA met or exceeded $17 million.[190] However, Authentix failed to meet those financial conditions, and Authentix' 2018 EBITDA was less than $10 million.[191] As such, this earnout was not paid.[192]

At the time of the sale of Authentix, B. Bailey owned 4.7% of Authentix common stock.[193] In the sale of Authentix to BWE, BWE granted B. Bailey "sweet

---

[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] PTO ¶ 54.
[188] *Id.*
[189] *Id.*
[190] JX625 at 3.
[191] JX746 at 7.
[192] PTO ¶ 54.
[193] JX758 (Q43).

30

equity" (aka "M shares") as a financial incentive for his continued role as an executive after the acquisition of Authentix by BWE.[194] The "M shares" are a form of restricted stock award that would only pay out if BWE exits Authentix and the common shareholders earn an 8% per annum return.[195] In other words, the "M shares" would not clear the restriction (i.e., would not be worth anything) in the event of an exit transaction after five years by BWE's management in which BWE's returns, as measured by multiple on invested capital, does not exceed 1.47x.[196] BWE granted B. Bailey 35.0% of the total "sweet equity pot."[197]

### 15. CUSGF III Extended its Term After the Sale of Authentix

While the deal to sell Authentix closed on September 13, 2017, ahead of the fund term of September 30, 2017, CUSGF III's IAC approved a two-year extension to CUSGF III's term.[198] CUSGF III had considered a term extension since August 2017 because of the possibility that CUSGF III would want to continue investments in Catapult Learning, one of two portfolio companies that the fund then held and continued to hold after the Authentix sale.[199] Of the three investments remaining at

---

[194] JX707 at 8; JX720 at 7; Tr. (B. Bailey) 1676:3–18.
[195] JX720 at 7 & n.1; JX707 at 8.
[196] JX720 at 7.
[197] JX707 at 8; Tr. (B. Bailey) 1676:3–18. The total sweet equity pot was agreed at 15.5% of the returns above the 8% return per annum to the common stockholders. JX707 at 8; JX720 at 7. The total sweet equity pot is split between 18 executives, with the final allocation to be agreed upon with B. Bailey. JX707 at 8. B. Bailey was allocated 35.0% of the total sweet equity pot. *Id.*
[198] JX733; Tr. (Coburn) 1725:14–20; Tr. (Gozycki) 1795:18–19.
[199] JX459; JX733; JX831; Tr. (Gozycki) 1794:3–1795:17; Tr. (Timmins) 718:10–24.

the time of Authentix' sale, Authentix was the largest.[200] As of June 30, 2017, before exiting its investment in Authentix, CUSGF III had returned $840.2 million to its investors, which is a 1.54x return on their investments.[201] CUSGF III's return on its Authentix investment was 0.89x, meaning it lost money.[202] As of December 31, 2021, CUSGF III remained open.[203]

*B. Procedural History*

On August 7, 2020, Plaintiffs Manti, Malone Mitchell, Winn Interests, Ltd., Equinox I. A TX, Greg Pipkin, Tri-C Authentix, Ltd., David Moxam, Jon Lal Pearce, and Jim Rittenburg filed a verified complaint for breach of fiduciary duties against Carlyle and the Director Defendants.[204] Plaintiffs filed an amended complaint (the "Complaint") on November 3, 2020, against Defendants, with Craig Johnstone joining the action as a Plaintiff.[205]

Defendants moved to dismiss the Complaint on November 17, 2020.[206] One issue raised in the motion to dismiss was whether the Stockholders Agreement, referred to above, to which the parties were signatories, served to waive any fiduciary duty claims in connection with the sale.[207] I denied Defendants' motion to

---

[200] Tr. (Timmins) 718:10–24.
[201] JX716 at 5.
[202] JX705 at 2; Tr. (S. Bailey) 1260:17–1262:12, 1263:5–23.
[203] JX751.
[204] *See* Verified Compl. for breach of fiduciary duties, Dkt. No. 1.
[205] *See* Verified Am. Compl., Dkt. No. 38 ("Compl.").
[206] *See* Defs.' Mot. to Dismiss Pls.' Verified Am. Compl., Dkt. No. 39.
[207] *See* Defs. Opening Br. in Supp. of Mot. to Dismiss Am. Compl. 18, Dkt. No. 39.

dismiss in memorandum opinions dated February 14 and June 3, 2022.[208]  I determined that Plaintiffs had not waived the right to bring this action asserting breaches of fiduciary duties related to the sale of Authentix.[209]  I also concluded that, based on plaintiff-friendly inferences at the pleading stage, entire fairness presumptively applied to the sale, precluding dismissal under Rule 12(b)(6).[210]  On September 14, 2023, I granted Plaintiffs' motion to add Tri-C Authentix Preferred, Ltd. as a Plaintiff.[211]

I conducted a seven-day trial on January 22 through January 30, 2024.[212] After trial, the parties submitted their respective post-trial briefs.[213]  I heard post-trial oral argument on June 20, 2024, and consider the matter submitted as of that date.[214]

---

[208] *See* Feb. Mem. Op.; *Manti Hldgs., LLC v. Carlyle Gp. Inc.*, 2022 WL 1815759 (Del. Ch. June 3, 2022) ("June Mem. Op.").
[209] Feb. Mem. Op. at *4.
[210] June Mem. Op. at *8–11.
[211] *See* Granted ([Proposed] Ord. Granting Mot. for Permissive Joinder of Tri-C Authentix Preferred, Ltd.), Dkt. No. 274.
[212] *See* Judicial Action Form re Tr. before Vice Chancellor Sam Glasscock dated 1.22.24 through 1.30.24, Dkt. No. 319.
[213] *See* Pl. PTOB; Defs.' Post-Trial Br., Dkt. No. 342 ("Def. PTAB"); Pls.' Post-Trial Reply Br., Dkt. No. 346 ("Pl. PTRB").
[214] *See* Judicial Action Form re Post Tr. Oral Arg. before Vice Chancellor Sam Glasscock dated 6.20.24, Dkt. No. 350.

## II. ANALYSIS

Plaintiffs contend that Carlyle (Carlyle Group, CUSGF III, Authentix Holdings, Carlyle Investment, and TCG) and the Director Defendants (B. Bailey, S. Bailey, Gozycki) are liable for breaches of their fiduciary duty in connection with the sale of Authentix.[215]  All other claims have been waived.[216]

I must address these allegations by applying, to the rather robust statement of facts above, a rather simple template of the law of corporate fiduciaries.  Carlyle, like Plaintiffs, was a holder of Authentix preferred and common stock.  I may assume that a majority of the directors were not independent of Carlyle.  Carlyle, as a stockholder was *owed* fiduciary duties by the directors, and was free to sell its stock for its own reasons and on its own timing.  Of course, when acting as a controller, Carlyle itself could owe fiduciary duties to the Company and its stockholders.  For instance, if it had stood on both sides of the transaction, Carlyle would be held to a fiduciary standard, and be liable absent entire fairness.  But as the facts recited above

---

[215] Pl. PTOB 47–48.

[216] Plaintiffs originally asserted a claim for breach of fiduciary duty and a claim for unjust enrichment that survived the motion to dismiss stage. June Mem. Op.  However, during post-trial briefing and argument, Plaintiffs only pursued their claim for breach of fiduciary duty, thus the unjust enrichment claim is waived. *Frederick Hsu Living Trust v. Oak Hill Capital P'rs III, L.P.*, 2020 WL 2111476 (Del. Ch. May 4, 2020) (holding that a claim for unjust enrichment was waived because plaintiff bore the burden of proof on a claim for unjust enrichment and during post-trial briefing and argument, the plaintiff only pursued his claim for breach of fiduciary duty); *see Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

indicate, the transaction was at arms' length and was the result of rather vigorous negotiation.

Carlyle could also be liable if it used its corporate control to compete with the majority for consideration. But the facts here show that consideration paid by BWE was distributed ratably.

Plaintiffs' theory is adjacent to the model just stated. Plaintiffs aver that Carlyle controlled Authentix throughout the sales process and Carlyle had conflicts of interest that resulted from pursuing a "different form of consideration" than minority stockholders, by which they "extract[ed] something uniquely valuable."[217] As such, Plaintiffs argue that the entire fairness standard applies because they have established a conflicted controller transaction.[218] Their argument runs as follows: Carlyle needed to sell in 2017 at the latest, to meet its investors' expectations. This business necessity, per Plaintiffs, caused Carlyle and the Board to sell to BWE in 2017, when it was crystal-clear that if Authentix had put off the sale until 2018, the stockholders would have received more than *twice* the consideration paid by BWE.[219] So overweening was Carlyle's need, apparently, that it left more than $100,000,000 of value behind, *of which more than 50% would have flowed to Carlyle.*

---

[217] Pl. PTOB 47–48, 53.
[218] *Id.* at 53.
[219] Pl. PTRB 47.

If it proved true that Carlyle thought it necessary to sell immediately, consequences (and price) be damned, that would create a conflicted controller transaction, and Carlyle would be liable, absent entire fairness.[220] Plaintiffs aver that Director Defendants are also subject to entire fairness review because they lack independence from the controller, Carlyle, which (as just explained) is conflicted.[221]

In other words, a simple predicate step must control my analysis. Have Plaintiffs met their burden to show that Carlyle's inclination to support a sale was in reality an imperative, such that the sale was not for the good of the entity and its owners, but instead was timed to drive a unique benefit to Carlyle? Only if Plaintiffs have met this burden must I address whether the resulting transaction was entirely fair.

I find that Carlyle does not have conflicts of interest that trigger entire fairness in connection to the sale of Authentix to BWE.[222] Accordingly, the business

---

[220] *See, e.g.*, *New Jersey Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888 (Del. Ch. Sept. 30, 2011) (holding there was a viable disabling liquidity need where an interested stockholder owed $12 million in settlement payments and $13 million in loans, had no sources of cash inflow, had recently paid out $4.4 million, and started a new business venture); *McMullin v. Beran,* 765 A.2d 910 (Del. 2000) (describing a sale process where a 80% controller proposed to sell entire company in an all-cash transaction, allegedly to satisfy need for cash to fund a separate acquisition, conducted the negotiations itself, and placed its own cash restrictions on potential bidders); *In re Morton's Rest. Gp., Inc. S'holder Litig.*, 74 A.3d 656 (Del. Ch. 2013) (reasoning that a private equity fund's relatively common desire to raise a new fund was not an unusual crisis requiring a fire sale and that private equity funds are naturally disincentivized to hastily seek below-market merger consideration to avoid alienating past investors).

[221] Pl. PTOB 48, 50–52.

[222] The parties disagree strenuously which Carlyle-related entities, named party-Defendants here, may have liabilities as co-controllers. *See supra* Figure One. Because I find that business judgement applies, I need not wade into this morass; instead, I may skirt it, dry-shod.

36

judgment rule applies, and I decline to review the transaction for breaches of fiduciary duty. My analysis follows.

### A. Carlyle Exercised Control Over Authentix and Director Defendants Lacked Independence from Carlyle

I note that Carlyle exercised control over Authentix. I find that CUSGF III (which owned Authentix stock through Authentix Holdings) and Authentix Holdings, on their own, had sufficient voting control of Authentix to make them controllers. A stockholder is considered a controller under Delaware law where the stockholder: "(1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but '*exercises control* over the business affairs of the corporation.'"[223] "A controlling stockholder need not be a single person or entity. A group of stockholders may be deemed a 'control group' and considered a controlling stockholder such that 'its members owe fiduciary duties to their fellow shareholders.'"[224] CUSGF III owned Authentix stock through Authentix Holdings,[225] and Authentix Holdings owned the majority of the preferred (70%) and common stock (52%) of Authentix.[226] With the majority of both the preferred and common stock by percentage, I find that CUSGF III and

---

[223] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)), *aff'd sub nom, Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[224] *In re Hansen Medical, Inc. S'holders Litig.*, 2018 WL 3025525, at *5 (Del. Ch. June 18, 2018) (quoting *In re Nine Sys. Corp. S'holder Litig.*, 2014 WL 4383127, at *24 (Del. Ch. Sept. 4, 2014)).

[225] PTO ¶ 26.

[226] *Id.*

Authentix Holdings had sufficient voting control of Authentix (over 50% of both the preferred and common stock) and thus, were controllers of Authentix.

I now turn to whether the Director Defendants lacked independence from Carlyle.[227] Plaintiffs argue that S. Bailey, Gozycki, and B. Bailey were all not independent of Carlyle.[228] I agree. S. Bailey was a Partner and Managing Director at Carlyle Group while he was on Authentix' Board as a designee of Carlyle.[229] Gozycki served on the Carlyle deal team for Authentix from 2008 to September 13, 2017 and was a Vice President before his promotion to Managing Director at Carlyle; he also served on Authentix' Board as the designee of Authentix Holdings from March 2013 to September 13, 2017.[230] As dual fiduciaries of Carlyle and Authentix, S. Bailey and Gozycki face "inherent conflicts of interest" if "Carlyle's interests diverged from the common stockholders with respect to the [s]ale."[231] In addition, B. Bailey was designated to Authentix' Board by Carlyle as the fifth director[232] and later became the CEO of Authentix.[233] As a senior corporate officer of Authentix, B. Bailey lacked independence from Carlyle.[234] This is supported by

---

[227] *See* June Mem. Op., at \*11.
[228] Pl. PTOB 50–53.
[229] PTO ¶ 30.
[230] *Id.* ¶ 31.
[231] June Mem. Op., at \*11 (citation omitted).
[232] PTO ¶ 58.
[233] *Id.* ¶ 59.
[234] *See* June Mem. Op., at \*11 (quoting *Berteau v. Glazek*, 2021 WL 2711678, at \*20 (Del. Ch. June 30, 2021)) ("Under the great weight of Delaware precedent, senior corporate officers

S. Bailey's description of B. Bailey as a "good soldier"[235] and "a great friend[] of Carlyle"[236] who "would do anything for [Carlyle]."[237]

In summary, CUSGF III and Authentix Holdings, at least, were controllers of Authentix. In addition, the Director Defendants did lack independence from Carlyle. However, I find below that Carlyle did not have conflicts of interests that trigger entire fairness review of the transaction.

### B. Carlyle Did Not Have Conflicts of Interest That Triggered Entire Fairness

Carlyle favored the sale of Authentix, but did not stand on both sides of the transaction; the ultimate sale to BWE was at arms-length. That does not end the fiduciary duty analysis, however. Under Delaware law, one category of a conflicted controller transaction that implicates the entire fairness standard is "transactions where the controller competes with the common stockholders for consideration."[238] A controller competes with common stockholders for consideration when it: "(i) 'receives greater monetary consideration for its shares than the minority

---

generally lack independence for purposes of evaluating matters that implicate the interests of a controller.").

[235] JX393 (email from S. Bailey to Coburn stating "[B. Bailey] was planning to exit and White Deer/Manti was going to bring Moxam in. So poor [B. Bailey] is being a good soldier to discuss staying with them").

[236] JX445 (email from S. Bailey stating "[B. Bailey], an incredible Chairman and CEO of a Carlyle portfolio company, please meet John Gammage, who covers Carlyle for JP Morgan. You are both great friends of Carlyle").

[237] JX378 (email from S. Bailey to Coburn stating "He's awesome. He would do anything for CARLYLE").

[238] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014).

stockholders,' (ii) 'takes a different form of consideration than the minority stockholders,' or (iii) extracts 'something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders.'"[239]   Plaintiffs do not contend that Carlyle received differential consideration implicating prongs (i) or (ii) above; they assert that entire fairness applies because a timely exit from Authentix was uniquely valuable to Carlyle, triggering entire fairness.  Under entire fairness review, if proved, the burden would shift to the Defendants to prove the fairness of the sale process and price.[240]

Plaintiffs argue that Defendants' exercise of control over the sale of Authentix to BWE was tainted by Carlyle's "liquidity-driven conflict," caused by end of CUSGF III's fund-life.[241]  Accordingly, Plaintiffs aver that the sale of Authentix is a conflicted controller transaction that triggers entire fairness.[242]

Plaintiffs argue that Carlyle had liquidity-based conflicts from fund-life and clawback provisions; considerations that drove them to sacrifice fair value for speed. The evidence at trial does not support this hypothesis, however.  In addition, I find that Carlyle's preferred shares of Authentix did not cause a conflict of interest from

---

[239] June Mem. Op., at *8 (quoting *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 810 (Del. Ch. 2022)).

[240] *See Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 722 (Del. Ch. 2023).

[241] Pl. PTOB 57; Pl. PTRB 31–32. Plaintiffs also alleged in their Complaint that Carlyle was entitled to preferential payment of its rights as a preferred stockholder, and thus did not care about receiving a fair price for its common stock. Compl. ¶¶ 1, 2, 106.  This unlikely theory is addressed below. *See* discussion *infra* Section II.B.2.

[242] Pl. PTOB 58.

the minority stockholders such that entire fairness is triggered.[243]   Accordingly, I

find that the business judgment rule applies.

> 1. Carlyle Was Not Operating Under a Liquidity-Based Conflict from Fund Life and Clawback Concerns

Plaintiffs argue that Carlyle had a liquidity-based conflict in that Carlyle

needed to sell off Authentix when it did due to the "time pressure" that Plaintiffs

aver Carlyle was facing.  This time pressure related to the end of the fund term of

CUSGF III, and to clawback concerns.[244]

> [T]here are very narrow circumstances in which a controlling
> stockholder's immediate need for liquidity could constitute a disabling
> conflict of interest irrespective of pro rata treatment. Those
> circumstances would have to involve a crisis, fire sale where the
> controller, in order to satisfy an exigent need (such as a margin call or
> default in a larger investment) agreed to a sale of the corporation
> without any effort to make logical buyers aware of the chance to sell,
> give them a chance to do due diligence, and to raise the financing

---

[243] Plaintiffs argue that the facts established at trial include facts that prove the allegations in the Complaint that this Court found to create a reasonable inference of a disabling conflict. *Id.* at 53–54.  The highlighted allegations are that:

> Steve Bailey's statement that he was under pressure from Carlyle to close the Sale quickly so that Carlyle could close its applicable fund, together with the nonratable benefit Carlyle received from its preferred stock holdings, and the Director Defendants' decision to cut the lone dissenting stockholder, Barberito, out of the deliberations, gives rise to a reasonable inference that Carlyle derived a unique benefit from the timing of the Sale not shared with other common stockholders, rendering it conflicted.

June Mem. Op., at *9.  At this post-trial stage and in consideration of the entire factual record—and absent the plaintiff-friendly inferences that previously obtained—I find that Plaintiffs have failed to meet their burden to demonstrate that Carlyle had a conflict of interest from liquidity pressure or its preferred shares.
[244] Pl. PTOB 9–11, 53–58.

necessary to make a bid that would reflect the genuine fair market value of the corporation.[245]

I find that, at this post-trial stage and given the entire factual record, Plaintiffs have failed to prove that Carlyle had a disabling liquidity-based conflict of interest that triggers entire fairness. The factual record does not demonstrate that Defendants were operating under such time pressure (from CUSGF III's fund term and investor expectations or otherwise) to sell Authentix so that they were willing to do a fire sale of the Company, accepting less than the fair value of their shares in return for an immediate sale.

### a. CUSGF III's Term and Investor's Expectations

Plaintiffs argue that Authentix was the last "needle moving deal" remaining in CUSGF III at the end of its fund life, so this created "enormous pressure" on Carlyle to sell Authentix to meet investor expectations and Carlyle acted consistently with that pressure.[246] Defendants point out that, as Authentix' largest stockholder, Carlyle had a direct financial incentive to maximize the value of the Company. They argue that while Carlyle wanted to sell Authentix in 2017, it did not *need* to sell Authentix; the sale was not liquidity-driven, but rather in the shared interest of the stockholders for financial reasons.[247] I find that the factual record demonstrates that

---

[245] *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1036 (Del. Ch. 2012).
[246] Pl. PTOB 5.
[247] Def. PTAB 62–70.

42

the sale of Authentix was not a fire sale driven by Carlyle acting under time pressure or liquidity pressure from the end of CUSGF III's fund life, in conflict to the minority stockholders' interests. While the facts certainly demonstrate that Carlyle wanted to exit its investment in Authentix in 2017, the facts do not demonstrate that Carlyle *needed* to exit its investment in Authentix or that Carlyle was otherwise driven by time pressure to exit that would cause it to accept less than fair value for Authentix shares, for itself as well as the minority stockholders.

First, CUSGF III was the largest owner of both preferred and common shares.[248] As the largest stockholder, CUSGF III had "an inherent economic incentive 'to negotiate a transaction that [would] result in the largest return for all shareholders.'"[249] Second, the fact that a controlling stockholder wants to sell their stake in a company is not, standing alone, a conflict that triggers entire fairness review. Unlike with, for interest, a need to sell stock to address a pressing liquidity crisis (i.e., a fire sale), the fact that a controller supports a sale does not demonstrate that the controlling stockholder was willing to accept less than fair value of their shares or was willing to cause the Board to deprive other stockholders of the fair value of their shares.[250] Here, CUSGF III's fund life was set to end on September

[248] PTO ¶ 26.
[249] *Firefighters' Pension Sys. City of Kansas City v. Presidio, Inc.*, 251 A.3d 212, 255 (Del. Ch. 2021) (quoting *Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002)).
[250] *See Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *18 (Del. Ch. Aug. 16, 2021).

30, 2017, but CUSGF III's ten-year term did not impose a deadline for selling its portfolio of companies.[251] Instead, Carlyle's funds can continue to hold investments after term expiration (and Carlyle's funds have done this before).[252] CUSGF III's term can also be extended to permit additional investment in portfolio companies (and Carlyle's funds have also done this before).[253] As such, even though Carlyle wanted to sell off its assets prior to the term expiration, there was nothing in the Limited Partnership Agreement that *required* it to sell off its assets or drove it to conduct a self-injuring fire sale.

Third, Authentix was not the only remaining asset in CUSGF III.[254] In fact, CUSGF III had considered a term extension since August 2017 (prior to the sale of Authentix) because of the possibility that CUSGF III would want to continue investing in Catapult Learning, one of two portfolio companies that the fund then held and continued to hold after the Authentix sale.[255] This indicates that regardless of whether the sale of Authentix occurred prior to the end of CUSGF III's term, the fund may have needed an extension for other investments. As such, I find that Carlyle was not under compelling pressure to sell Authentix prior to the end of

---

[251] JX3; Limited Partnership Agreement § 2.7; Tr. (Coburn) 1681:12–1688:2.
[252] Tr. (S. Bailey) 1113:17–1115:1; Tr. (Coburn) 1684:15–1685:10.
[253] Limited Partnership Agreement § 2.7; Tr. (Coburn) 1683:13–1684:2; Tr. (S. Bailey) 1116:18–1117:3, 1117:10–15.
[254] JX459; JX733; JX831; Tr. (Gozycki) 1794:3–1795:17.
[255] JX459; JX733; JX831; Tr. (Gozycki) 1794:3–1795:17.

CUSGF III's term, such that its self-interest, shared with the minority, to maximize value was overborne.

Plaintiffs point to the fact that Authentix was the largest of the three remaining investments in CUSGF III at the time of Authentix' sale[256] to demonstrate that the sale of Authentix was a "needle moving deal" that investors cared about.[257] Plaintiffs argue that Carlyle was thus driven by investor pressures and expectations to sell Authentix as soon as possible and not wait for a value-maximizing transaction that would benefit all stockholders.[258] I find this argument unpersuasive, based on the evidence developed at trial. Plaintiffs failed to submit evidence that indicates Carlyle's investors were pressuring Carlyle to sell Authentix as soon as possible.[259] Instead, Plaintiffs equate investor requests for updates on fund performance and potential exit timing as pressure for immediate liquidation of CUSGF III.[260] For example, Plaintiffs point to an email from an investor of CUSGF III (and multiple other Carlyle funds) to inquire about "upcoming liquidity in [their] portfolio," "real needle moving deals" in each of the funds, and the expected final returns from each of the funds.[261] In addition, Plaintiffs point to an email from a Carlyle employee that states that there are two "recurring requests" for either quarterly, weekly, or monthly

---

[256] Tr. (Timmins) 718:10–24.
[257] Pl. PTOB 5, 7.
[258] *Id.*
[259] *See* Pl. PTOB; Pl. PTRB.
[260] *See, e.g.*, Pl. PTOB 6 n.17 (citing JX826); Pl. PTOB 6 n.16 (citing JX640).
[261] JX640.

45

reports on fund performance for a number of funds, including CUSGF III.[262] However, these emails do not demonstrate investor pressure for Carlyle to liquidate CUSGF III as soon as possible, as the investors are simply requesting information about their investments (which they are owed).[263] What is missing is any direct indication that limited partners were insisting on a quick sale. I find no investor pressure demonstrated in this record that could show that Carlyle had a need for a quick exit through a fire sale sufficient to deviate its interests from the minority.

Plaintiffs point to an email where, after Authentix was sold and CUSGF III's term was extended by its IAC, an investor stated "Our new CIO just has a very firm view that agreed upon terms should be adhered to and that funds should liquidate in the agreed upon time. I am pleased that the fund term got extended and I very much appreciate the management fee concessions granted."[264] This investor had opposed Carlyle's request to extend CUSGF III's term, but Carlyle received support from the majority of the IAC and the extension was granted.[265] First and foremost, this email concerned matters after the sale of Authentix, and does not demonstrate investor

---

[262] JX826. In the email, a Carlyle employee states "[t]here are also two recurring requests that we provide: [REDACTED] (quarterly) and [REDACTED] (monthly/weekly)." *Id.* In a follow-up, the same Carlyle employee provides a detailed list of the information that various investors are requesting in reports, including information on capital calls and distributions for certain funds. *Id.* In the email, CUSGF III is referred to as CGP III. *Id.*

[263] JX640. In fact, the investor in this email qualified their request by stating it was "to gain a better understanding of upcoming liquidity in [their] portfolio, along with the expected return for some of [their] more mature funds." *Id.*

[264] JX732.

[265] *Id.*

pressure concerning specifically the sale of Authentix. Even if this evidence was extrapolated to demonstrate general investor sentiment regarding fund terms, I find that it has the opposite effect. CUSGF III received support from the majority of the IAC (compromised of major investors),[266] demonstrating that investors were not exerting "enormous pressure"[267] on Carlyle to liquidate CUSGF III sufficient for Carlyle to have an incentive to accept less than fair value for its investments, including Authentix.

Plaintiffs instead argue that pressure on Carlyle to sell Authentix by September 2017 arose from the fund investors' "well-understood expectations."[268] To support this argument based on investors' general expectations, Plaintiffs point to expert testimony from Jim Timmins and textbooks that discuss the private equity industry generally.[269] For example, Plaintiffs cite expert testimony from Timmins stating that in private equity, "[l]imited partners always want to know where they stand *vis-a-vis* liquidity"[270] and "not returning funds on a timely basis . . . can be a black mark. . . to secure commitments for a new PE fund"[271] while returning capital on a timely basis is "a five-star rating."[272] In addition, Plaintiffs point to a private

---

[266] *Id.*; Tr. (Coburn) 1683:13–1684:2, 1689:4–18.
[267] Pl. PTOB 5.
[268] *Id.* at 8.
[269] *Id.* at 5–8.
[270] Tr. (Timmins) 678:8–9.
[271] *Id.* at 683:20–22.
[272] *Id.* at 684:1–4.

47

equity textbook that states "[a] fund's fixed life cycle generally provides *some structure* over the *expected cadence* of realizations to LPs,"[273] and "[a] PE firm's ability to achieve timely and profitable exits reliably across multiple funds is a key measure of success applied by financial market players; it allows the PE firm . . . to approach . . . institutional investors again for future fundraising."[274]

I take from this evidence that which is obvious; a standard ten-year fund life indicates an intent to exit investments, profitably, on that general time-frame. I find this insufficient to demonstrate specifically CUSGF III's investors' expectations were such that Carlyle caused the Board to run a fire sale. To prove a liquidity-driven conflict of a controller, it is not enough to show a general interest in investors that a fund adhere to a timeline; a plaintiff must show sufficient evidence "of a cash need" that explains why "rational economic actors have chosen to short-change themselves."[275] "[S]weeping characterizations" of the "industry writ large" are insufficient.[276] And the private equity lifecycle "is not so formulaic and structured that the cycle itself [can] support an inference of a liquidity-based conflict."[277] The

---

[273] JX819 at 30 (emphasis added). Plaintiffs point out that this passage was written by Marco De Benedetti, who, at the time of writing the passage, was the Managing Director and Co-Head of European Buyouts at The Carlyle Group. *Id.* at 29. However, this passage is written for a private equity textbook generally, and not specific to CUSGF III and the sale of Authentix; thus it is only generally relevant here.
[274] *Id.* at 21.
[275] *See Larkin v. Shah*, 2016 WL 4485447, at **16, 17 (Del. Ch. Aug. 25, 2016).
[276] *See id.* at *17.
[277] *Firefighters' Pension*, 251 A.3d at 257.

testimony from the expert witness and the excerpts from the private equity textbook that Plaintiffs point to do not indicate that Carlyle and CUSGF III specifically faced investor pressures for exiting Authentix prior to the end of CUSGF III's term such that they would take an immediate sale at a loss, but rather states generalized industry and textbook explanations of private equity, including how fund lifecycles generally operate. None of this evidence is specific to Carlyle and CUSGF III. And, as I found above, Plaintiffs fail to point to any facts that demonstrate that the investors of CUSGF III themselves were pressuring Carlyle to liquidate as soon as possible.

Finally, the comprehensive marketing and sales process of Authentix is evidence against liquidity pressure.[278] The process took a full year.[279] Baird ultimately contacted a total of 127 potential buyers, including 27 financial buyers.[280] Baird's outreach yielded 18 fireside chats with potential buyers.[281] When Barberito expressed interest, on behalf of Manti, to submit a bid for Authentix, the Board accommodated Barberito and gave Barberito access to the data room for him to catch up in the sales process.[282] There is no indication that Carlyle caused Authentix or

---

[278] *See, e.g.*, *Morton's*, 74 A.3d at 668 (nine-month process); *Synthes*, 50 A.3d at 1037 (seven-month process).
[279] *See* JX221 (email from B. Bailey on September 21, 2016 stating that "Baird has begun initiating scoping calls on Project Affirm"); PTO ¶¶ 1, 54 (sale of Authentix to BWE closed on September 13, 2017).
[280] JX336 at 4.
[281] *Id.*
[282] JX350 at 2; Tr. (Barberito) 550:22–551:16; Tr. (S. Bailey) 1216:6–1217:1; Tr. (B. Bailey) 1530:13–1532:15.

Baird to fail to contact logical buyers, contact too few buyers, or refused to work with any particular buyer.[283] As such, while it is not dispositive, the comprehensive sales process that took a full year is indicative that Carlyle was not driven by a liquidity pressure to sell off Authentix for less than fair value.[284] In addition, as I discuss further in the clawback provision analysis below, I find that the record demonstrates that Carlyle was interested in moving quickly because of the volatility of Authentix' business rather than due to liquidity pressure because of the fund life.[285]

Plaintiffs point to evidence that the Board should have known that extending the process would have increased value, bolstering their assertion that Carlyle did not care about price, only timing. They point to Barberito, who sat on the Board on behalf of Manti, and expressed the opinion in 2017 that a higher present value for Authentix would likely be achieved by suspending the sales process for a year, over which time the Company's prospects would improve.[286] Perhaps. Or perhaps, as the Board with the exception of Barberito, testified was their fear, the momentum of

---

[283] *See Morton's*, 74 A.3d at 659 n.6, 667; *see also Synthes*, 50 A.3d at 1037.

[284] I note that the sales process began in September 2016 when Baird launched scoping calls and lasted until September 13, 2017 when the sale of Authentix closed—a full year—excluding the preparation time with Baird that began after Baird was hired on January 8, 2016. JX221; PTO ¶¶ 1, 36.

[285] *See* discussion *infra* Section II.B.1.b.

[286] JX711 at 1.

Authentix growth over the past four years would be lost, decreasing value.[287]  There are of course risks with either course of action, as well as real costs for failing to consummate a long running sales process only to restart it a few months later.  Authentix' susceptibility to customer instability would remain in either case.  In any event, the case for delay is not of sufficient weight to cause me to conclude that a "fire sale" must have occurred, in light of the other evidence.  To sell now or wait for a better opportunity later?  Absent a showing of a conflicted transaction, this is the very stuff of which business judgment is made.

Accordingly, I find that Plaintiffs have failed to prove that Defendants were driven by a liquidity-based conflict from the "time pressure" from the end of the CUSGF III's term and investor's expectations to conduct a fire sale.

### b. The Clawback Provision

Plaintiffs also argue that Carlyle's deal team pushed for a quick sale to avoid the clawback mechanism, rather than waiting for the potential to earn more money by selling off Authentix in the future.[288]  In other words, because certain Carlyle affiliates faced a potential disgorgement of funds, Defendants drove a sale in 2017, to the detriment of the minority *and* Carlyle itself.  The record, to my mind, does not support such a finding.

---

[287] Tr. (S. Bailey) 1245:23–1247:1; Tr. (Vigano) 1340:5–16; Tr. (B. Bailey) 1592:1–6; Tr. (Gozycki) 1797:20–1798:13.
[288] Pl. PTOB 9–11.

Plaintiffs point to certain communications from Carlyle deal team members (including S. Bailey) that discussed the clawback provision to support their argument.[289] This evidence does not persuade me that the transaction was conflicted. First, some of the emails that Plaintiffs point to are simply Carlyle deal team members discussing the possibility of CUSGF III entering clawback and the effects of such on personal distributions.[290] These emails are just general discussions of the clawback provision and do not indicate any "personal pressure" to avoid a clawback. The emails do not discuss selling off portfolio companies of CUSGF III, including Authentix, to avoid clawback specifically. Accordingly, I find that these emails do not indicate that Carlyle deal team members were so concerned with avoiding a clawback that it was a "potent motivator that colored their judgment."[291]

In addition, I find that the clawback provision has an incentive structure that does not place pressure on Carlyle's deal team members to sell portfolio companies at less than fair value in a fire sale. If Authentix was growing faster, in terms of proceeds, than the 7% preferred return (compounded annually), then CUSGF III

---

[289] *See, e.g.*, JX487 (email from S. Bailey including a table of distributions subject to clawback that is "personal for printing"); JX573 (email from a Carlyle employee to S. Bailey discussing how a clawback in a fund affects S. Bailey's distributions); JX572 (email thread discussing CUSGF III and the risk of the fund entering clawback); JX68 (email stating "The key, as you'd expect, is the Authentix sale, obviously the price but also the speed"); JX67 (email from Brooke Coburn to Carlyle deal team members discussing CUSGF III slipping into clawback and stating "we really need to execute on the pending exits" for Authentix and another portfolio company).

[290] *See* JX487; JX573.

[291] Pl. PTOB 10.

would not be at risk of clawback, as there would be no shortfall in the preferred return for which carried interest distributions would need to account for.[292] On the other hand, if Authentix was declining in proceeds, then CUSGF III would be at risk of clawback if it could not meet the 7% preferred return on the investment capital still outstanding in Authentix prior to its sale. As such, the clawback incentivizes the Carlyle deal team to: (1) hold onto portfolio companies that are growing in proceeds, which generally protects against a clawback and increases overall proceeds for the fund (including its limited partners and the Investment Limited Partner) and (2) sell portfolio companies that are more likely to decline than grow in proceeds, which returns the capital to the limited partners[293] *and* benefits all shareholders of the company through a sale prior to further decline. Accordingly, the incentive structure is not indicative that Carlyle's deal team conducted a fire sale to avoid a clawback, but instead implies that the Carlyle deal team was interested in selling Authentix because it may decline in value; and that it would be best for all shareholders, regardless of the clawback, to sell before the value further declined.

---

[292] *See* discussion *supra* Section I.A.4; Tr. (Timmins) 778:5–12.

[293] I acknowledge that, by returning the capital out for Authentix back to the limited partners after the sale of Authentix, the 7% preferred return ceases as well. *See* discussion *supra* I.A.4. This inherently protects against further clawback as the deal team does not have to return more distributions of carried interest to make up for shortfall of the 7% preferred return for a longer period of time. This is, essentially, Plaintiffs' argument that clawback encouraged a fire sale. But, as I discuss above, selling a company that is in decline also maximizes value for all shareholders (as further decline would be harmful to all shareholders), which I find to be Carlyle's deal teams' interest in selling the Company.

While not dispositive, this is further supported by the fact that CUSGF III continued to hold onto Catapult Learning, another portfolio company, after its fund term ended, because the deal team believed Catapult Learning still had some further appreciation left.[294] I note that Plaintiffs' "clawback scenario"—that Carlyle personnel wanted to sell because Authentix was declining in proceeds, putting their own finances at risk—is directly converse to Plaintiffs "timing pressure" scenario—that Carlyle wanted to sell quickly despite knowing that the market would not in 2017 recognize the fact that Authentix was poised for growth.

In line with the above, Defendants argue that Carlyle's deal team was interested in selling Authentix quickly because the Company was not appreciating in value anymore (rather than any pressure from the fund life or the clawback provision).[295] S. Bailey testified at trial in response to one of the email communications,[296] the "best way . . . to both avoid clawback and generate more carry" is to "build value in your companies"; "selling something quickly doesn't help you unless that asset" is depreciating.[297] In addition, the Board, with the exception of Barberito, all testified that they believed Authentix was more likely to

---

[294] *See, e.g.*, Tr. (Gozycki) 1798:18–24 ("Because at this time we believed there was more room to run. We thought there was some further appreciation left in Catapult [Learning].").
[295] Def. PTAB 77–80.
[296] JX67.
[297] Tr. (S. Bailey) 1245:5–1247:1.

decline further financially than grow.[298]  I find this testimony credible in light of the performance of Authentix.  In 2017, Authentix was facing a year-over-year decline in revenue and EBITDA.[299]  In addition, even after Authentix won the contract for Aramco in 2017 after the rebidding process,[300] it was on diminished terms.[301]  And even given the contract renewals for Ghana Tax and Aramco,[302] the Company faced volatility in their customer base,[303] which was concerning to the bidders during Authentix' sale process.[304]

I find that Carlyle's deal team was not driven to conduct a fire sale by the "pressure" to avoid a clawback provision.

### c. Internal and External Communications

Plaintiffs argue that consistent with the time pressure the fund life and clawback concerns created, Carlyle had a number of internal and external communications that "proclaimed this time pressure."[305]  For the sake of completeness, I discuss these below.  I have examined these communications carefully, and to my mind, they indicate nothing other than a general intent to exit

---

[298] Tr. (S. Bailey) 1245:23–1247:1; Tr. (Vigano) 1340:5–16; Tr. (B. Bailey) 1592:1–6; Tr. (Gozycki) 1797:20–1798:13.

[299] Tr. (S. Bailey) 1240:11–1241:2; Tr. (Gozycki) 1790:11–23; JX846 at 8.  Authentix' EBITDA dropped by approximately 33% from 2016 to 2017. JX337 at 2; JX746 at 7.

[300] JX663; JX685; JX192 at 6; JX179; Tr. (B. Bailey) 1491:4–1492:12.

[301] JX589; JX591 at 1.

[302] JX586; JX663; JX685.

[303] *See, e.g.*, Tr. (Pearce) 168:5–173:23.

[304] *See* JX274 at 3.

[305] Pl. PTOB 11.

Authentix, and not that Carlyle had a need to sacrifice value for an immediate sale.

I find that, even in considering these communications, Plaintiffs have failed to prove

that Carlyle had a liquidity-based conflict.

First, Plaintiffs point to a number of Carlyle "internal deliberations" that

Plaintiffs interpret as Carlyle being willing to sell Authentix at less than fair value

to liquidate CUSGF III.[306]   I do not find this interpretation persuasive.   These

communications demonstrate that Carlyle preferred to sell off Authentix, especially

given the Company's struggles, but not that Carlyle needed to sell Authentix even if

---

[306] Pl. PTOB 11–15. *See, e.g.*, JX157 at 9 (a presentation for an April 4, 2016 CUSGF III IAC meeting with an Authentix valuation overview that states an anticipated exit of December 2016); JX92 at 8 (a presentation for a September 17, 2015 CUSGF III IAC meeting with an Authentix valuation overview that states an anticipated exit of December 2016); JX81 at 27 (a presentation for an April 2, 2015 CUSGF III IAC meeting with an Authentix valuation overview that stated an anticipated exit of December 2015); JX168 (email thread between Coburn and S. Bailey on May 16, 2016 discussing the Aramco situation and Coburn stating "Wondering if we should just go now and structure Saudi as an earnout or similar? Waiting 2 months not the end of the world, but a Sept launch will make it hard to do a deal this year" and "I do think our bias should be to sell this year [2016]"); JX202 (email on September 13, 2016 from Coburn to S. Bailey, Gozycki, and another Carlyle individual in preparation for a September 14, 2016 IAC meeting that states they should do a "detailed update for each of the remaining companies with an emphasis on our liquidity plan"); JX211 (email on September 15, 2016 from Coburn to S. Bailey stating that Coburn would like to be looped in for the sales process discussions of Authentix because it is "so important to the fund, and has huge carry implications for the firm"); JX231 (email on October 12, 2016 from Coburn to S. Bailey and other Carlyle individuals stating that for the secondary sale process "[o]ur goal is to monetize the remaining CVP II and/or CGP III stub assets by year-end."); JX260 (email thread in late November 2016 to early December 2016 with Carlyle employees discussing how the secondary sale process bids were "disappointing;" Coburn stated that the "[g]oal is to have this all wrapped up in '17, if possible" and that the most likely outcome "is that we will sell Authentix in 1H'17 at somewhere between 1.25-1.5x"); JX318 (email on February 9, 2017 in which Thomas Fousse, a Carlyle affiliate, asked Coburn for an update on the sale processes for the remaining assets in CUSGF III and stated "[w]ould be nice if there was closure on this fund"); JX317 (email thread from February 8–9, 2017 in which S. Bailey gave Coburn a "discouraging" update on the Authentix sale process, Coburn stated that they were "struggling" in the "hottest seller's market of all time" and "I have to think there's a way to monetize [Authentix] . . . this year," S. Bailey replied with "I agree with getting out asap," and Coburn replied with "I won't force you to sell anything").

it meant sacrificing fair value.[307] In addition, CUSGF III had two additional portfolio companies at the time of Authentix' sale, so the fund could not be liquidated even after the sale of Authentix.[308]

Second, Plaintiffs point to a number of communications within Baird and between Carlyle and Baird to show that Carlyle's communications to Baird focused exclusively on fund life considerations.[309] Plaintiffs argue that these

---

[307] For example, in an email on August 4, 2016 from Coburn to two individuals requesting for senior contacts at Aramco, Coburn stated the following:

> We are in the late stages of preparing to launch a sale of Authentix, but their annual contract with Aramco recently came up for renewal and, given the changes at Aramco, is now caught in a cycle of month-to-month extensions. This puts us in a fairly awkward position, as the contract is material. **We could potentially defer the exit a year or two, but its very possible Aramco will be in the same position next year.** Additionally, this is one of the last remaining assets in an older fund that we are **hoping** to liquidate soon.

JX185 (emphasis added).

[308] JX459; JX733; JX831; Tr. (Gozycki) 1794:20–1795:17; Tr. (Timmins) 718:10–24.

[309] Pl. PTOB 15–17. *See, e.g.*, JX169 (email on May 17, 2016 between Trisha Renner and other Baird affiliates in which Renner states "my big question will be around Carlyle goals? Is it 2016 or are they prepared to hold longer if that maximizes valuation?"); JX177 (email on June 30, 2016 from Trisha Renner to other Baird affiliates stating "I should have been less direct on Steve's response to timeline but [it's] getting old"); JX210 (email on September 15, 2016 from Trisha Renner to other Baird affiliates stating "suggest we let Bernard do his work and then we 1:1 get [S]teve Bailey one more time. I don't know wha[t] else to say to him without sounding negative, not sure he understands"); JX229 (an October 12, 2016 internal Baird memo with a bullet point that states "We advised Carlyle not to launch at this time given the uncertainty around the contract extension and early stages of diversification, but they asked us to execute a scoping process given their hold period ends in mid-2017 and we have all the marketing materials completed"); JX228 (an email thread on October 11, 2016 between Trisha Renner, B. Bailey, and other Carlyle and Baird team members that discusses how the Aramco contract award is not expected till April 2017 and B. Bailey stated "April is a good deal more problematic in light of our timeline"); JX680 (internal email thread to Baird dated August 30, 2017 in which Trisha Renner stated "Talked to [B. Bailey], targeting sign 9/6 working on NWC, escrow, mgmt agreements. We discussed it is odd that we are not involved and he said that is Carlyle/Bailey approach and Bailey is hell bent on getting this done by 9/6 so no reflection on us"); JX543 (email from Trisha Renner to other Baird

communications demonstrate that Baird detected Carlyle's inclination to sacrifice value for timing's sake.[310]  I do not find this argument persuasive.  The record demonstrates that, contrary to Plaintiffs' argument, Baird did not recommend that Authentix stop its sales process because of timing issues.  As Trisha Renner (a member of Baird's team working on the sale of Authentix) testified at trial, credibly, in my view, Baird recommended Authentix begin the scoping process in Fall 2016 in advance of a broad sales process in 2017.[311]  As such, Baird's advice during the sale process does not indicate that Baird believed that Carlyle was sacrificing value for timing pressures, even if Baird did believe that Carlyle preferred to sell Authentix and "wanted out."

Third, Plaintiffs argue that Barberito objected to the sale process because a number of communications between Carlyle and Barberito made him believe the sale was driven by pressure to exit by September 2017 (for fund life considerations).[312]  I believe that Barberito believes that the sale was conflicted.  I

---

affiliates on June 12, 2017 stating "I don't remember who asked last week about pulling the plug but I don't think in the category of good client service we can do that. This situation continues to be challenging whether it is continued degradation of the financials, lack of contract renewals, geo-political situations out of the Company's hands. Our CEO is challenging and Carlyle seems to simply want out").

[310] Pl. PTOB 16.

[311] Tr. (Renner) 1400:1–23 (clarifying the JX229 Baird internal memorandum that states "We advised Carlyle not to launch at this time given the uncertainty around the contract extension and early stages of diversification. . . .").

[312] Pl. PTOB 17–18.  First, Plaintiffs point to a March 2017 Board meeting where Barberito was "dismayed" to learn Carlyle was willing to sell Authentix to Intertek for below expectations and according to Barberito's testimony and journal notes, S. Bailey explained at that meeting that Carlyle needed sale proceeds by September 2017. Pl. PTOB 17 (citing JX76 at 62; Tr. (Barberito)

58

do not find Barberito's testimony[313] and "journal notes"[314] persuasive, however, given the lack of evidence of investor and fund life pressure. Plaintiffs argue that S. Bailey's contemporaneous communications corroborate Barberito's testimony.[315] However, the sole communication that Plaintiffs cite is an email from S. Bailey to Baird and B. Bailey discussing how "[Barberito] also threw out the idea of delaying the whole process to see if [Aramco] comes in" and how "[S. Bailey] obviously told [Barberito] we ran a process we are where we are and are trying to get any buyer to close asap."[316] To my mind, this communication indicates Carlyle's preference to conclude the ongoing sale process (a very public process that had proceeded over a span of months) but does not demonstrate that Carlyle's reasoning is based its own internal needs, for which it was willing to sacrifice value.

Fourth, Plaintiffs argue that the fact that Authentix' potential buyers were repeatedly told about the approaching end of Carlyle's fund period proves that Carlyle was in fact under "time pressure" and sacrificing value to achieve timing

---

356:3–10). Second, Plaintiffs point to a March 2017 phone call between Barberito and S. Bailey when Barberito requested the opportunity to intervene to buy out Carlyle with other stockholders. Pl. PTOB 17–18. At trial, Barberito testified that S. Bailey was "adamant" that a deal had to be closed by September 2017 in the call, and Plaintiffs argue that Barberito's contemporaneous journal notes corroborates his testimony. Pl. PTOB 18 (citing Tr. (Barberito) 362:15–363:8; JX76 at 64). Third, Plaintiffs point to a June 2017 call between Barberito and S. Bailey; at trial, Barberito testified that S. Bailey called him "[p]anicked that deal wouldn't close by September 2017." Pl. PTOB 18 (citing Tr. (Barberito) 399:6–12, 400:4–9; JX76 at 113).

[313] *See, e.g.*, Tr. (Barberito) 353:6–354:15, 355:23–24, 356:3–10, 362:15–363:8, 378:11–13, 398:1–399:12, 399:6–12; 400:4–9, 536:1–18.

[314] *See, e.g.*, JX76 at 62, 64, 78, 113.

[315] Pl. PTOB 18.

[316] JX402.

objectives.[317]  I find this position untenable because merely mentioning Carlyle's "hold period" does not mean Carlyle was sacrificing value for timing objectives.  As S. Bailey testified at trial, referencing the hold period to buyers is "very standard" because it is standard for buyers to ask, "who owns this company" and "how long have they owned it."[318]  In addition, S. Bailey also testified that discussing the "hold period" conveys the seriousness of the seller in the transaction, which was necessary for Baird to convey after Authentix had begun, then stopped, the sale process for a

---

[317] Pl. PTOB 19–20. *See, e.g.*, JX216 (September 18, 2016 script for scoping calls that states "[t]he shareholders are planning to launch a full sale process next year after receiving the contract extension, but given their extended hold period they are open to giving a small group an early chance to acquire the business this year ahead of a full process"); JX245 (November 17, 2016 email that describes message from Baird to Intertek that "seller has reasonable value expectations / fair value for asset balancing their timing objectives."); JX249 (November 21, 2016 Baird report on discussion with another prospective buyer that states "Discussed process, he said why go now if you have the renewal [for Aramco]. . . [I answered] Carlyle a seller, Bernard getting tired and does want to give the right transition period, [w]e think you can deal with [Aramco] by structure"); JX264 (December 16, 2016 internal Baird email that discusses how Baird told Intertek "expect the client has reasonable value expectations for an asset with this type of growth considering their fund life considerations"); JX298 at 2 ¶ 23 (notes from January 26, 2017 meeting with Innospec that states "[t]iming for sale – Authentix is in Carlyle No2 fund of 14 companies, only 3 left, so time to bale"); JX300 at 4 (internal Innospec presentation from January 30, 2017 that states "Carlyle need to exit – fund closure"); JX341 at 3 (a script for a March 6, 2017 call between Baird and Intertek that states "given shareholder dynamics/fund life considerations, cash up front is critical" in regards to an earn out approach); JX435 at 2 (a script for a April 2017 call between Baird and Intertek that states "[w]hat has become clear now, however is that Carlyle and JH Whitney are going to sell the business now (by 'now' I mean in the next few months)"); JX493 at 257 (an internal April 2017 BWE post-due diligence report that states "Carlyle are a forced seller as they have reached the end of the fund's investment life and are required to exit by September 2017. They are selling at a sub-optimal time, given there is contract uncertainty"); JX735 at 32 (Baird contact summary for a prospective buyer who thought it was an "odd time to do a deal given the Saudi renewal") ; JX735 at 34 (Baird contact summary for a prospective buyer that states "Told him no specific guidance, but seller has reasonable value expectations and fund life considerations"); JX735 at 99–100 (Baird contact summary for Innospec in late January 2017 where Innospec asked "[w]hy is the Company for sale now?").
[318] Tr. (S. Bailey) 1190:21–1191:6.

portion of the Company years prior.[319] I find S. Bailey's testimony credible, as it is also corroborated by Renner's testimony. At trial, Renner testified that a financial advisor will often have to explain how long a private equity fund has held a company and why it is selling the company. Renner stated "you've got to explain one of two things: if it's less than three years or if it's more than five. Those you have to explain, because if it's less than three years, why are you doing a quick flip? If it's more than five, why do you still own it?"[320] Accordingly, I find that the references to "hold period" to Authentix' potential buyers are not indicative of Carlyle sacrificing value for timing objectives.[321]

Fifth, Plaintiffs point to an email between an Authentix customer and B. Bailey to argue that even Authentix' customers were told that Carlyle was "under time pressure to sell."[322] In the email, among other things, the customer stated, "[w]hile you didn't state it specifically, I understood that Carlyle has a by-law that requires sale of investments after 10 years. The 10 year cycle with Authentix is this fall which is motivation to sell or requires an exception."[323] B. Bailey replied "[a]ll of the points you have outlined in the note below are accurate."[324] I do not find this

---

[319] *Id.* at 1191:10–1192:8.
[320] Tr. (Renner) 1404:16–1405:1.
[321] The "end of fund" pitch appears to be puffing of the "our loss is your gain!" variety beloved by retailers.
[322] Pl. PTOB 21.
[323] JX578 at 1.
[324] *Id.*

61

argument persuasive to demonstrate that Carlyle was in a fire sale. This email is in line with what the record demonstrates – that Carlyle had a fund term for CUSGF III of 10 years ("by-law"), that Carlyle can extend the fund term of CUSGF III ("an exception"), and that Carlyle had a preference to sell off its portfolio companies, like Authentix, within the 10-year period ("motivation to sell"). Once again, I find that nothing in this email indicates Carlyle *needed* to sell Authentix; it indicates that Carlyle *wanted* to sell Authentix. As I stated above, Carlyle simply *wanting* to sell off Authentix prior to the end of the fund term is not sufficient to show that Carlyle was willing to sacrifice fair value for its own stock or drive the Board to sacrifice fair value for the stock of minority stockholders. As the holder of the majority of Authentix' stock, Carlyle's motivation was to maximize value.

Finally, Plaintiffs point to communications internal to two private equity firms, BWE and WDE, to indicate that Carlyle was under a disabling time pressure from CUSGF III's term.[325] However, these communications were BWE and WDE's impressions of Carlyle's situation and are not sufficient to demonstrate that Carlyle indeed was operating under "time pressure" such that it would sacrifice value of

---

[325] Pl. PTOB 21–22. *See* JX493 at 257 (internal BWE memorandum from April 20, 2017 that states "Carlyle are a forced seller as they have reached the end of the fund's investment life and are required to exit by September 2017"); JX395 at 26, 33 (internal WDE memorandum from March 27, 2017 that states "[b]ecause the Carlyle fund that Authentix is held in is nearing the end of its fund life, Carlyle marketed the Company late last year despite two large customer contracts being up for renewal" and "[t]his valuation [$107 million purchase price] is a result of Carlyle's end-of-fund life issue and the contingent bids received in the auction process due to the uncertainty around the [Aramco] and Ghana contracts" respectively).

Authentix to achieve an immediate sale of Authentix. The communications do not indicate that Carlyle was telling these private equity firms that Carlyle must sell off the Company as quickly as possible. Plaintiffs do point to one communication between Sikorski at BWE and S. Bailey in which Sikorski stated he was "sensitive to [S. Bailey's] time pressure and objectives."[326] I find this communication unpersuasive as well. At trial, Sikorski testified that he does not remember specifically what he and S. Bailey discussed, but that "they were pushing [BWE] for a quick close"[327] and he referred to "Carlyle's timing objectives, which they had indicated to [BWE] were short."[328] This, to my mind, does not prove that Carlyle was seeking a fire sale (that would sacrifice value for speed) for fund life or investor expectation reasons, just that Carlyle was interested in moving quickly to consummate a deal process that had been ongoing for months, and in light of volatility in Carlyle's customer base.

In other words, the record does demonstrate that Authentix and Carlyle were motivated to sell. The same record is insufficient, in my mind, to amount to proof of a need or intent to sacrifice maximized present value for an immediate sale. The very length and breadth of the sale process demonstrate otherwise. Accordingly, I find that these communications, in totality, do not sufficiently demonstrate that

---

[326] JX507.
[327] Tr. (Sikorski) 2038:15–16.
[328] *Id.* at 2039:6–7.

Carlyle was acting under time pressure from the fund life and clawback provisions and was sacrificing value in turn. Instead, these communications are consistent with the record that demonstrates Carlyle wanted to sell off Authentix and wanted to move quickly in the sale process. This is not, in my view, a conflict with the minority that invokes entire fairness.

### 2. Carlyle's Receipt of Consideration for its Preferred Stock Does Not Constitute a Non-Ratable Benefit That Triggers Entire Fairness

Plaintiffs argue that Defendants received a non-ratable benefit from the sale, because it owned preferred shares.[329] I find that, without a showing that Carlyle had a unique need for liquidity that constitutes a disabling conflict, Carlyle's receipt of consideration for its preferred shares does not constitute a non-ratable benefit that triggers entire fairness.

The order of payout in the event of a sale of Authentix was as follows:

> [T]o Series D, until a senior liquidation preference was paid out at 1.75x the amount invested plus a running dividend of 8.50% that began to accrue on the second anniversary of the investment;
>
> [T]o Series A and Series B, *pari passu*, until their liquidation preferences were paid out at 1.00x the amounts invested; and
>
> [T]o common stock, plus participation by Series D, and in-the-money stock options[,] any money that remained.[330]

---

[329] Pl. PTOB 57–58; Pl. PTRB 31–32.
[330] PTO ¶ 53.

Based on the liquidation preferences, from the sale of Authentix where $87.5 million was eventually paid out,[331] approximately $70 million was first distributed to preferred stockholders from the Series A, B, and D investments (after all expenses were paid and excluding participation of Series D for common stock value in the last order of payout in the waterfall distribution).[332] CUSGF III received approximately $48.6 million from holding 70% of the preferred shares (excluding participation of Series D for common stock value in the last order of payout in the waterfall distribution).[333]

Without evidence that Carlyle had a unique need for liquidity from fund life considerations, Carlyle's interests were aligned with the common stockholders as the largest common stockholder of Authentix.[334] Carlyle held 52% of the common shares.[335] Whether the sale of Authentix was for $87.5 million or $200 million (based on Plaintiffs' valuation),[336] Carlyle had the most to gain from a higher sale value from distributions for its common shares, as the distributions for the preferred shares would remain as approximately the first $70 million in consideration, either

---

[331] *Id.* ¶ 54.
[332] JX758. Approximately $69,033,862 was distributed to preferred stockholders and $803,081 was distributed for Series D dividends (excluding participation of Series D for common stock value in the last order of payout in the waterfall distribution). *Id.*
[333] PTO ¶ 26; JX758.
[334] PTO ¶ 26.
[335] *Id.*
[336] Pl. PTRB 47.

way,[337] and for every dollar over $70 million, approximately $0.50 went to Carlyle.[338]

To recapitulate, Carlyle is a controller. It did not stand on both sides of the transaction. As the largest stockholder, Carlyle's interest was in maximizing value. Absent a need for a quick sale that overrode this interest in value, Carlyle's interests were aligned with the minority, and entire fairness is not invoked.

I find, after trial, that Plaintiffs have failed to rebut the business judgment rule because there is no conflicted controller transaction. As discussed above, the Director Defendants' decisions are only reviewed under entire fairness if they lack independence from a conflicted controller such that they themselves have a conflict of interest with the minority stockholders. Here, Carlyle is a controller but does not have a disabling conflict of interest that triggers entire fairness. As such, the controller-affiliated Director Defendants were not incentivized to sell Authentix at a less-than-fair price to the special benefit of Carlyle, as no such benefit is demonstrated in the record. The business judgment rule applies.

### C. B. Bailey's Alleged Conflict is Not Pertinent

Plaintiffs also aver that B. Bailey had his own interests that diverged from the

---

[337] JX758. Of the approximate $70 million, Carlyle's portion would remain as approximately $48.6 million. *Id.*

[338] Tr. (Timmins) 779:7–21. It is not $0.52 because Series D stock had a participation feature as well. *Id.*

other stockholders.[339]  Plaintiffs point to B. Bailey's "special cash bonus"[340] and BWE's grant of "sweet equity" to B. Bailey[341] as evidence of B. Bailey's personal conflicts of interest.[342]

Because I find that the interests of the controller were aligned with the minority, the presence of a controller does not sterilize the business judgment of the directors concerning the sale.  Because B. Bailey is only one member of the Board, the majority of which was not interested in the transaction, I need not consider his conflict in approving the transaction further.

*D. Business Judgment Rule*

"When the business judgment rule applies, the board's business decisions 'will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment' for the board's notions."[343]  Accordingly, I defer to the Board and decline to review the fairness of the transaction.

## III. CONCLUSION

For the foregoing reasons, I find for the Defendants on Count I (breach of fiduciary duty against Director Defendants) and Count II (breach of fiduciary duty

---

[339] Pl. PTOB 58.
[340] JX48 at 2–3.
[341] JX707 at 8; Tr. (B. Bailey) 1676:3–18.
[342] Pl. PTOB 58–60.
[343] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

against Carlyle).  The parties should submit a form of order consistent with this Memorandum Opinion.